**[J-8A-C-2025] [MO: McCaffery, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 38 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 788 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006112-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED: March 5, 2025 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 39 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 790 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006114-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED: March 5, 2025 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 789 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006113-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED: March 5, 2025 |

**DISSENTING OPINION**

**CHIEF JUSTICE TODD**                                    **DECIDED: January 28, 2026**

The majority concludes that, "[w]hen the admissibility of the defendant's other bad acts is premised upon the common plan, scheme, or design exception, the Commonwealth must establish" that either: (1) those prior offenses constitute "signature crimes" which "are so unique and distinctive that they must have been committed by the same perpetrator;" or (2) "the offenses were linked to achieve a common goal." Majority Opinion at 36.[1] Based on this principal conclusion, the majority finds that, here, the evidence of each of the rapes committed by Appellant Derrick Walker "would not be admissible in a separate trial for the others pursuant to the common plan, scheme[,] and design exception to the prohibition against propensity evidence," as, in the majority's view, "that exception requires either signature crimes or bad acts linked to achieve a common goal—neither of which is present here." *Id.* Additionally, the majority finds that rape kit reports which were entered into evidence at Appellant's trial without testimony from the nurse examiners who prepared them violated Appellant's constitutional right to confront witnesses against him. *See id.* at 53, 55. In light of these findings, the Court concludes that Appellant is entitled to a new trial; thus, it vacates his judgment of sentence and remands for further proceedings. Because I disagree with the majority's determinations with respect to both questions on which we granted review, I must, respectfully, dissent.

## I. Background

---

[1] Although portions of the lead opinion do not represent a majority of the Court, for ease of reference, I will nevertheless refer to that opinion as "majority" or "Majority Opinion."

As the majority delineates, this matter arises from sexual assaults committed by Appellant Derrick Walker against three different women. The facts pertaining to each of the three victims follow.[2]

**P.C.** – At approximately midnight on January 20, 2011, P.C. walked from her home to a nearby 7-Eleven convenience store in Philadelphia. While she was standing outside of the store, Appellant approached her, displayed a wad of cash, and said to her, "you know what to do for this." N.T., 10/28/21, at 50. Feeling fearful, P.C. accompanied Appellant to the rear of the store, where, once out of sight of other people, he grabbed her, pulled her into an alley, and demanded that she drop to her knees. P.C. cried out "no," whereupon Appellant pushed her to the ground and punched her in the face, before attempting to force his penis into her mouth.

When P.C. refused to perform oral sex on Appellant, he grabbed her by her shirt, slammed her onto the hood of a parked car, pulled down her pants, and forced his penis into her vagina. Appellant also attempted to sodomize P.C. After Appellant finished his attack, P.C. pulled up her pants and walked unsteadily to the front of the convenience store. Appellant told P.C. to wait while he went inside the store to get some money for her, to which P.C. responded that she was not a prostitute. As Appellant entered the store, P.C. ran home, where her husband awakened and learned what had happened. P.C.'s husband then called the police and took P.C. to the hospital, where she received treatment and underwent a sexual assault examination.[3]

---

[2] Each victim is herein referred to by her initials to protect her privacy interests.

[3] A sexual assault examination is a form of medical examination which a victim may undergo following an assault, in which a sexual assault nurse examiner, who has specialized training, collects information from the victim pertaining to demographics, medical history, medications, allergies, and surgeries; takes the victim's vital signs; and asks focused questions regarding the history of the alleged sexual assault. *See* N.T., 10/28/21, at 115-16. Utilizing this information, the nurse examiner then, with the patient's consent, performs a focused physical examination which includes evidence collection (continued…)

**T.A.** – On December 2, 2014, at approximately 12:30 p.m., T.A. walked to a donut shop in Philadelphia, where she encountered Appellant, who was standing outside of the shop and initiated a conversation with her, claiming that he was selling headphones. T.A. agreed to look at the headphones and, while she walked with Appellant, he put his arm around her shoulders. As a former drug addict, T.A. was not alarmed by Appellant's action in this regard because she had previously participated in drug transactions in which dealers would place their arms around a buyer to give the appearance of familiarity to onlookers. However, T.A. became alarmed when Appellant put a knife to the base of her neck and told her to keep walking and not to do anything conspicuous. Appellant then took T.A.'s iPhone and other personal belongings and told her that she would get her items back only if she did what he told her to do. After leading T.A. into an isolated alleyway, Appellant pushed her to the ground and forced her to perform oral sex on him. Appellant also vaginally raped T.A. while pressing her against a metal fence. When Appellant finished his assault, he told T.A. to leave and did not return her belongings. T.A. ran to a nearby store and called her boyfriend and the police. She later received treatment and underwent a sexual assault examination at the Philadelphia Sexual Assault Response Center ("PSARC"), during which a nurse examiner prepared a rape kit report.[4]

**B.H.** – In the late morning hours of January 12, 2015, B.H. was walking around her neighborhood in Philadelphia, trying to get a sense of the area as a new resident. During her walk, B.H. encountered Appellant and asked him if he knew of a place to buy loose cigarettes, commonly referred to as "loosies." Appellant replied that he sold loosies, but

---

from areas of the body where the victim indicated the perpetrator made physical contact. *Id.*

[4] The rape kit reports completed at PSARC during a sexual assault examination generally include a victim's responses to standard questions and medical background, as well as notes of testing performed for sexually-transmitted diseases. The reports also include a single-page chain of custody form completed by the treating nurse.

that he did not have any on him and would need to retrieve some from his home. B.H. walked with Appellant to a nearby house, where he directed her to an isolated area in the rear of the property. Appellant entered the house while B.H. waited outside. Shortly thereafter, B.H. felt someone, later identified as Appellant, put a hand over her mouth from behind and push her to the ground. As Appellant attempted to pull B.H.'s jeans down, he removed his hand from her face, and she began to scream. Appellant then struck B.H. in the back with a tire iron, pulled her pants down, and forcibly penetrated her vagina with his penis. When the assault concluded, Appellant ran away, and B.H. went home and called the police. Officers arrived at B.H.'s home and she led them to the location of the attack, where they recovered the tire iron. B.H. later underwent a sexual assault examination and received treatment at PSARC. During that examination, the nurse examiner prepared a rape kit report.

On December 12, 2018, DNA recovered from all three victims was determined to be a match for the same perpetrator. Six months later, Appellant's DNA was connected to the three open cases via the Combined DNA Index System. Subsequent retesting of Appellant's DNA against the DNA recovered from the three victims confirmed that he was the source thereof. Consequently, in July 2019, Appellant was arrested and charged with rape at three separate dockets — one for each victim. Relevant to the instant appeal, the trial court later granted the Commonwealth's motion to consolidate the three cases, over Appellant's objection. Additionally, the trial court denied Appellant's motion *in limine* demanding that the nurse examiners who prepared the rape kit reports concerning B.H. and T.A. testify at trial.

The matter, thus, proceeded to a consolidated jury trial, at which the Commonwealth introduced evidence consistent with the foregoing, including testimony from all three victims, and introduced the rape kit reports related to B.H. and T.A. via

testimony from Allison Denman, a sexual assault nurse examiner and the Clinical Director at PSARC. The reports each included a single-page chain of custody form which was completed by the examining nurses, as well as the victims' responses to standard questions, medical background, and notes of testing performed for sexually transmitted diseases. Notably, Denman testified that, when victims present to PSARC following assaults, care is provided to them regardless of whether they seek to file official police reports, and the questions contained in reports are intended to help the nurses in identifying injuries, prescribing medications, and issuing emergency contraception. For his part, Appellant claimed that all three victims were engaged in prostitution at the time of the alleged assaults, maintaining that they consented to the sexual encounters.

Ultimately, the jury convicted Appellant of three counts of rape and related offenses, and the trial court later sentenced him to an aggregate term of 28 to 56 years imprisonment. Appellant then appealed to the Superior Court, asserting that the trial court erred in: (1) granting the Commonwealth's motion to consolidate the three cases under the theory that the three separate crimes were indicative of a common plan or scheme; and (2) denying his motion *in limine* to require the nurses who prepared the rape kit reports to testify. With respect to the latter claim, Appellant maintained that the Commonwealth's introduction of the reports through Denman's testimony violated his right to confrontation under the Sixth Amendment to the United States Constitution, and he alternatively averred that the reports should not have been admitted because they constituted inadmissible hearsay.

In its Pa.R.A.P. 1925(a) opinion, the trial court rejected Appellant's claim that it erred in granting the Commonwealth's motion to consolidate the cases, finding that the evidence from each of the cases would have been admissible in trials for the other cases based on a common scheme or plan. In that regard, the trial court reasoned that

Appellant enacted a common plan, scheme, or design, whereby he predatorily selected vulnerable women who were strangers to him to satisfy his sexual deviancy. More specifically, the trial court explained that, in all three cases, Appellant approached women who were walking alone in outside environments, lured and directed them to isolated locations, brutally raped them, and viewed them as prostitutes, deserving of harm. Additionally, the trial court stressed that Appellant's defense at trial with respect to all three victims was consent and that he, therefore, attacked the credibility of the victims, such that the Commonwealth needed the testimony regarding all three assaults to refute Appellant's consent defense. The trial court also determined that the crimes were separable by the jury, in light of the instructions provided, wherein the trial court directed the jury to evaluate the evidence pertaining to each offense separately.

The trial court similarly found no merit to Appellant's contention that it had erred in denying his motion *in limine* regarding the rape kit reports. From the trial court's perspective, Appellant's right to confrontation was not violated, as the reports were not testimonial in nature. Rather, the trial court opined, the reports were created for the primary purpose of providing medical treatment to the victims, and not for future litigation, given that the nurses providing treatment to the victims were not agents of the Commonwealth. Accordingly, the trial court concluded that Appellant was due no relief.

In a unanimous, unpublished memorandum opinion, the Superior Court affirmed. *Commonwealth v. Walker*, 788-790 EDA 2022 (Pa. Super. filed Nov. 30, 2023). First, the court found no abuse of discretion in the trial court's decision to consolidate the three cases. In so doing, the court agreed that the evidence of each offense would have been admissible in a separate trial for the other offenses under the common plan, scheme, or design exception to Pa.R.E. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion

the person acted in accordance with the character."), thus rendering consolidation appropriate under Pa.R.Crim.P. 582(A)(1)(a) ("Offenses charged in separate indictments or informations may be tried together if[] . . . the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion."). Indeed, the court determined that the similarities among the three cases were striking for the reasons identified by the trial court, including Appellant's selection of victims and the pattern of his assaults on those victims. Moreover, the court opined that the evidence was capable of separation by the jury so as to avoid danger of confusion because the assaults occurred on different dates, at different locations, and involved different victims, thus satisfying Pa.R.Crim.P. 583 ("The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together."). Relatedly, the court found that Appellant was not unduly prejudiced by the consolidation of cases, as the evidence presented was indicative of Appellant's common plan or scheme and was not the type which would merely show his propensity to commit crimes, the trial court instructed the jury to consider the evidence separately regarding each victim, and the Commonwealth needed the evidence from all three cases to counter Appellant's consent defense.

The court likewise rejected Appellant's claim that the trial court erred in denying his motion *in limine* with respect to the rape kit reports. More precisely, the court agreed with the trial court's assessment that the reports in question were not testimonial in nature, as the primary purpose therefor was rendering aid and assistance to the victims of Appellant's assaults. In support of this finding, the court highlighted Denman's testimony that the purpose of the reports was to help the examining nurses to identify injuries, prescribe medications, and issue emergency contraceptives, as well as her

representation that the same care would have been provided to the victims regardless of whether they sought to officially report the assaults. As such, the court concluded that Appellant's right to confrontation was not violated.

The court additionally found that Appellant's assertion that the reports constituted inadmissible hearsay was meritless. The court reasoned that the reports fell within two exceptions to the rule against hearsay: statements made for medical treatment and records of a regularly conducted activity. With respect to the former, the court opined that "the reports were reasonably pertinent to medical treatment and described the 'inception of general character of the cause' of symptoms and sensations, thus satisfying the medical records exception." *Walker*, 788-790 EDA 2022, at 19 (quoting Pa.R.E. 803(4)). In the latter regard, the court determined that Appellant's "bald contention that the reports do not satisfy the business records exception because they are unreliable" was "unsubstantiated by the record," as "[t]here was no evidence of abnormality in the collection of the swabs or chain of custody." *Id.* To that end, the court emphasized that Appellant neglected to cross-examine Denman about the collection of evidence or chain of custody, nor did he otherwise seek to demonstrate the untrustworthiness of the process. Moreover, the court noted that Denman, who is herself a sexual assault nurse examiner, testified regarding the process of completing the examination reports, including how, when, and why the reports are created, establishing that they are contemporaneous records of regularly conducted activity. Therefore, the court rejected Appellant's hearsay argument. Accordingly, the court affirmed Appellant's judgment of sentence.

We subsequently granted allocatur to determine whether consolidation of Appellant's three rape cases was improper, and, relatedly, to clarify the appropriate test to be applied in assessing whether evidence is admissible under the common plan, scheme, or design exception to Pa.R.E. 404(b). We also granted review to consider

whether admission of the rape kit reports into evidence without accompanying testimony from the nurse examiners who prepared them violated Appellant's rights under the Confrontation Clause, as well as whether those reports constitute inadmissible hearsay.

## II.       Consolidation

As relevant to our review in this case, various criminal offenses may be tried together — *i.e.*, consolidated — pursuant to Pennsylvania Rule of Criminal Procedure 582(A)(1):

> (1) Offenses charged in separate indictments or informations may be tried together if:
>
> > (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
> >
> > (b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1). Conversely, "[t]he court may order separate trials of offenses . . . if it appears that any party may be prejudiced by offenses . . . being tried together." Pa.R.Crim.P. 583. As the majority explained, one manner in which the Commonwealth may prove that consolidation is appropriate is via the exceptions to the prohibition on the use of propensity evidence, also known as "other bad acts" evidence or "other acts" evidence, codified in Pennsylvania Rule of Evidence 404(b).

Specifically, under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, the Rule provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). Finally, the Rule clarifies that, when an

exception to the general prohibition of other bad acts evidence is applicable, the evidence is "admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.*

Our Court first contemplated the common law use of other acts evidence to show a defendant's plan in *Shaffner v. Commonwealth*, 72 Pa. 60 (1872), which forms the paramount basis of Appellant's argument and the majority's overarching decision. In *Shaffner*, at the defendant's trial for murdering his wife, Nancy, the Commonwealth sought to introduce evidence that, several months before the defendant murdered Nancy, he murdered John Sharlock, who was the husband of the defendant's paramour, using the same poison to effectuate both murders. The Commonwealth proffered that both decedents exhibited similar symptoms prior to their deaths, that both died at the defendant's home, and that they died within months of each other. In this regard, the Commonwealth intended to utilize the evidence of the defendant's involvement in Sharlock's murder "as evidence that he also poisoned his own wife." *Id.* at 66. Contemplating the use of such evidence, the Court initially found that there needed to be a connection between the two murders to render evidence pertaining to Sharlock's murder admissible at the defendant's trial for Nancy's murder. The Court explained:

> To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other.

*Id.* at 65. Thus, applying this notion to the facts before it, our Court concluded that the evidence pertaining to Sharlock's death did not bear a sufficient connection to the death of Nancy to justify its admission at trial because the defendant had not contemplated taking Nancy's life prior to murdering Sharlock. We reasoned:

> It is obvious that to connect together the deaths of Sharlock and Nancy, and make the former bear upon the latter, they must have been both contemplated by the prisoner as parts of one plan in his mind, in which the taking of Sharlock's life was part of his purpose of taking the life of Nancy. He must, therefore, have contemplated the death of Nancy before taking the life of Sharlock. In order to let in the poisoning of Sharlock, the judge must have had before his mind some fact or facts exhibiting this pre-existing determination to take Nancy's life. Herein the evidence was defective.

*Id.* at 66.

In the ensuing century and a half, we recurrently applied the general concept delineated in *Shaffner* and further developed the parameters for using evidence of other uncharged acts at a defendant's trial. One notable case assessing the standard for the introduction of other acts evidence post-*Shaffner* is *Commonwealth v. Wable*, 114 A.2d 334 (Pa. 1955), which the majority and Appellant contend initiated a deterioration of the *Shaffner* standard. *See* Majority Opinion at 15 ("Although the *Shaffner* Court purported to limit the common plan, scheme or design exception to bad acts committed for the purpose of an overarching common goal, or signature crimes, over the years, this Court has relaxed the strict parameters surrounding the exception."). In *Wable*, the defendant was accused of murdering a truck driver, Harry Franklin Pitts, while he was asleep in the cab of his truck on the Pennsylvania Turnpike in Westmoreland County. At Wable's trial, the Commonwealth introduced evidence that, three days prior to murdering Pitts, Wable murdered another truck driver, Lester B. Woodward, while that man was likewise sleeping in the cab of his truck at a point on the Pennsylvania Turnpike in Westmoreland County; and that, three days after murdering Pitts, Wable shot a third truck driver, John K. Shepard, who was asleep in the cab of his truck on an Ohio highway located approximately 15 miles from the Pennsylvania Turnpike. The Commonwealth demonstrated that both Woodward and Pitts were shot in the head in the early morning hours — each dying instantaneously — for the apparent purpose of robbery. The

Commonwealth similarly established that Shepard was shot in the head and robbed, although he survived and testified at Wable's trial, identifying Wable as the man who perpetrated the shooting.

On appeal, our Court rejected Wable's challenge to the Commonwealth's introduction of the evidence pertaining to Woodward and Shepard, finding that the trial court committed no error in deeming it admissible, given the similarities between the three crimes, including that Wable used the same gun for each incident and committed the offenses in "an almost uncanny" manner. *Wable*, 114 A.2d at 337. In reaching this conclusion, we stressed that, "sometimes there exist the 'special circumstances' which operate as exceptions to the general rule" that a distinct crime cannot serve as "proof of the commission of another," thus "bring[ing] the case within the . . . principle that evidence of other crimes *is* admissible when it tends to prove a common scheme, plan or design" which embraces the commission of multiple crimes "so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial." *Id.* at 336 (emphasis original). Stated differently, the Court found that other acts evidence is admissible "where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other." *Id.* at 336-37. Significantly, the Court did not purport to create a new rule governing the admissibility of other acts evidence for purposes of demonstrating a common plan, scheme, or design, or proving a defendant's identity as the perpetrator of multiple acts, but, rather, merely reiterated a "familiar principle" previously enunciated by "[a] veritable multitude of authorities in our appellate courts." *Id.* at 337; *see id.* at 337 n.2 (citing, *inter alia*, *Commonwealth v. Strantz*, 195 A. 75, 81 (Pa. 1937) (observing that "evidence of other crimes is competent to prove the specific crime charged when it tends to establish," *inter alia*, "a common scheme or plan

embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others" or "the identity of the person charged with the commission of the crime on trial," and clarifying that, to fall within the purview of this rule, "there must be evidence of a system between the offense on trial and the one sought to be introduced" which demonstrates that they are "connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both" (citation omitted)); *Commonwealth v. Parker*, 143 A. 904, 906 (Pa. 1928) ("Although it is a well-known rule of evidence that, in the trial of a defendant for a crime, no other independent, unconnected offenses committed by him are admissible to establish the fact of the commission of the crime on trial, yet, where there actually exists an evidentiary connection between the two crimes, so that the proof of one tends to prove the other, they are no longer independent and unrelated, and it is competent to introduce evidence of the one in the trial of the other."); *Commonwealth v. Bell*, 135 A. 645, 647 (Pa. 1927) (finding that evidence of uncharged acts "was admissible under the well-settled rule that evidence of similar and unconnected offenses may be offered to show guilty knowledge, design, plan, motive, and intent when such is in issue"); *Commonwealth v. Weiss*, 130 A. 403, 404 (Pa. 1925) (stating that, if evidence of uncharged acts "may indicate the motive or plan of action of the defendant, either preceding or following the commission of the crime, and is so closely joined thereto as to show the probability that he was guilty of the offense charged, it can be properly received"); *Commonwealth v. Coles*, 108 A. 826, 827 (Pa. 1919) ("It often happens, however, that the two distinct offenses are so inseparably connected that the proof of one necessarily involves proving the other, and in such case on the prosecution for the one, evidence proving the other cannot be excluded because it proves the other.")).

Approximately 60 years after *Wable*, our Court had another noteworthy opportunity to further hone and define the standard for admission of other acts evidence in the modern era, following our earlier adoption of Pa.R.E. 404(b), which serves to codify the common law rule. In *Commonwealth v. Arrington*, 86 A.3d 831 (Pa. 2014), noting that evidence of other criminal activity is admissible to establish a common scheme only if "the probative value of the evidence . . . outweigh[s] its potential for prejudice against the defendant" and "a comparison of the crimes . . . establish[es] a logical connection between them," *id.* at 842 (citation omitted), we determined that the Commonwealth was entitled to introduce evidence of the defendant's violent treatment of his past girlfriends at his trial for the murder of his most recent girlfriend. We found that such evidence "was not introduced in an attempt to portray [Arrington] as a habitual criminal with a propensity for violent behavior," but was, instead, "offered to establish that [he] acted pursuant to a common plan or scheme," whereby he engaged in "repeated efforts to preserve intimate relationships through harassment, intimidation, and physical violence culminating in the use of a deadly weapon." *Id.* at 844. Observing that, with respect to each girlfriend, the evidence demonstrated that Arrington monitored their activities, resorted to violence when they attempted to end their relationships, inflicted head and neck injuries upon them with his fists and other weapons, and harmed or threatened to harm members of their families or male acquaintances, we concluded that the "shared characteristics of each relationship" placed the evidence within the purview of Rule 404(b)'s exception to the prohibition on propensity evidence. *Id.* Our Court explained that the evidence of Arrington's past criminal conduct toward his ex-girlfriends "illustrated a distinct behavioral pattern that strengthened the prosecution's case," and "proved that [Arrington] would use deadly force to prevent a woman from leaving him." *Id.* at 844-45.

Even more recently, in *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017), we again whittled the contours of the common plan, scheme, or design exception under Rule 404(b). Therein, the defendant, Charles Ray Hicks, who was on trial for murder of a woman who was a known prostitute and drug user, challenged the Commonwealth's use of testimony from various women with whom he had engaged in sexual relationships — usually in the vein of prostitution and involving drug usage — regarding Hicks's assaults against them. In rejecting Hicks's contention that the trial court abused its discretion in admitting this testimony into evidence because the only similarity between the incidents was in his alleged use of his hands on or around the women's necks, this Court determined that the other acts bore a logical connection to the charged crime. More precisely, we found that the evidence of Hicks's prior relationships and assaults showed that he interacted with drug-dependent women who were often engaged in prostitution, resorted to violence when those women did not act in accordance with his desires, inflicted injuries to their necks, and orally threatened to kill them. We reasoned that "[t]hese similarities not only establish[ed] the required logical connection between the prior assaults and the circumstances surrounding the victim's death, [but that] they also present[ed] a 'virtual signature' for purposes of proving common scheme, intent and identity." *Id.* at 1128.

Two Justices authored concurring opinions in *Hicks*. Specifically, Chief Justice Saylor initially opined that "various majority opinions of this Court, like the decisions of a number of other courts, have incorrectly blended various distinct grounds for relevance associated with proffered, uncharged misconduct." *Id.* at 1130 (Saylor, C.J., concurring) (citation omitted). In that regard, Chief Justice Saylor agreed, in part, with Justice Donohue's dissenting opinion, discussed *infra*, that "majority opinions of this Court . . . have substantially diluted the putatively stringent standard associated with at least one of

these, namely, proof of identity via a *modus operandi* theory." *Id.* (citation omitted). Nevertheless, the former Chief Justice did not view the case before the Court "as one truly implicating an identity-based theory of relevance." *Id.* at 1131. Rather, Chief Justice Saylor reasoned that the Commonwealth's proffered evidence of Hicks's other assaults upon women "went toward negating his defense that the [victim's] death was an accident," or, in other words, "was employed by the prosecution primarily to establish the *actus reus* of the murder by corroborating" the Commonwealth's evidence indicating that "the victim's death resulted from 'homicidal violence,'" as opposed to a "mishap." *Id.* The remainder of Chief Justice Saylor's concurrence focused on the so-called "doctrine of chances,"[5] based upon which he concluded that the other acts evidence was admissible at Hicks's trial to prove that the victim's death was not accidental.

The late Justice Baer also penned a concurring opinion, in which he agreed that Hicks was not entitled to a new trial based on the trial court's admission of the other acts evidence, albeit on the basis that the trial court's action in that regard constituted harmless error. From Justice Baer's perspective, the Commonwealth presented overwhelming and uncontradicted evidence, aside from the other acts evidence, which refuted Hicks's position that the victim's death was accidental and readily established his guilt.

Most pertinent for purposes of this case is the dissenting opinion authored by Justice Donohue.[6] Therein, Justice Donohue opined that the majority's holding that the

---

[5] We have described the doctrine of chances as "the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all." *Commonwealth v. Donahue*, 549 A.2d 121, 126 (Pa. 1988) (citation omitted).

[6] Justice Wecht joined in Justice Donohue's dissent, but wrote separately to emphasize that, although he would have found that the admission of the other acts evidence was harmless, he agreed that Hicks was nonetheless entitled to a new trial because the Commonwealth conceded that, if the admission of such evidence was deemed to be erroneous, any such error was not harmless.

other acts evidence was admissible "contort[ed] the exceptions to the prohibition against the admission of bad acts evidence, thereby stripping . . . Hicks . . . of his presumption of innocence and allowing a conviction based upon [his] prior propensity to commit violent acts." *Id.* at 1142 (Donohue, J., dissenting). In Justice Donohue's summation, "[t]o patrol the boundaries between the prohibition [on propensity evidence] and its exceptions, we have consistently required evidence of purportedly admissible bad acts to evince either signature-like similarities or a true logical connection to the charged crime." *Id.* at 1143. Ultimately, Justice Donohue reasoned that, under *Shaffner*, *supra*, a link is required between the charged activity and the uncharged acts to justify admission for purposes of proving motive, common scheme, or plan, stressing that, from her perspective, mere similarities between the acts should not be sufficient grounds on which to establish admissibility of the evidence. Justice Donohue also acknowledged that evidence could be admissible if it demonstrated a "signature" for purposes of proving identity, as was the case in *Wable*, although she criticized the *Wable* Court's conclusion that the other acts evidence utilized therein was admissible to prove a common scheme or plan as well, positing that this aspect of the Court's decision "opened the door to a decades-long misunderstanding about what type of connection is truly required for the purpose of proving a common scheme." *Id.* at 1146.

Endeavoring to differentiate the use of other acts evidence for demonstrating identity from using it to show a common plan or scheme under Rule 404(b), Justice Donohue opined that "invocation of the common scheme exception should be limited to circumstances from which a true plan or motive can be inferred," whereas "[s]triking similarities, on the other hand, may be admissible to show identity, intent or lack of accident, which may also be shown by evidence of a common scheme." *Id.* In this vein, Justice Donohue elucidated that, in her view, the former of these two grounds for

admissibility requires the Commonwealth to establish "that the bad acts and the charged crime were 'both contemplated by the prisoner as parts of one plan in his mind' such that 'it is obvious' that committing the prior act 'was part of his purpose' in committing the charged crime." *Id.* at 1144 (citing *Shaffner*, 72 Pa. at 65-66). Justice Donohue, thus, urged that, for "Rule 404(b) is to accomplish its intended purpose, it must be strictly construed in light of the common law principles underlying it, as articulated by this Court more than a century ago" in *Shaffner*. *Id.* at 1156 (citation omitted).

Justice Donohue's dissenting opinion in *Hicks* seemingly forms the genesis of the majority's view in this case. Indeed, here, the majority echoes Justice Donohue's viewpoint that our Court has, in the past century and a half, eroded the admissibility standard for other acts evidence first enunciated in *Shaffner*. *See* Majority Opinion at 28 ("The problem is, over the years, those 'other purpose' exceptions have threatened to swallow the intention of [Rule 404(b)]. This is especially true of the judicially-crafted common plan, scheme, or design exception."). The majority, thus, presumes that — beginning with *Commonwealth v. Rush*, 646 A.2d 557, 561 (Pa. 1994) (delineating that, to introduce evidence of other acts to establish identity based on the similarity between the acts and the charged crime, "several factors to be considered are the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed"), and continuing through *Arrington* and *Hicks* — our Court formulated the "logical connection" or "sufficient similarities" test, which "does not demand the same high level of similarities between the acts as admission under the *modus operandi* or signature crime exception," nor "require proof of an overarching plan or scheme linking the criminal acts together. . . ." Majority Opinion at 29-30 (citation omitted). On this basis, the majority contends that the standard employed in *Arrington* and *Hicks* represents a departure from that which was "envisioned in *Shaffner*," claiming

that it is little more than a "hybrid" of the two exceptions to the rule against the use of other acts evidence which were explored therein. *Id.* at 30.

Consequently, opining that the "logical connection" test disregards the purpose of Rule 404(b), the majority concludes that evidence pertaining to a defendant's other bad acts which "is premised upon the common plan, scheme, or design exception" is admissible only if the Commonwealth establishes that: (1) the other acts "constitute 'signature crimes'" which "are so unique and distinctive that they must have been committed by the same perpetrator;" or (2) the other acts "were linked to achieve a common goal." *Id.* at 36 (citing *Shaffner*, 72 Pa. at 65).

Just as I was unpersuaded by this line of reasoning in *Hicks*, I am equally unpersuaded by it now. From my perspective, our Court has not misapprehended *Shaffner*, but, rather, has continued to craft a workable standard for the use of other acts evidence to prove common plan, scheme, or design in the modern era. *See Estate of Grossman*, 406 A.2d 726, 731 (Pa. 1979) ("It is the essence of common law courts today as in earlier times to view the body of the law as a living and developing legal system designed to serve societal needs in elevating the life and utility of the law rather than as a static set of rules."); *Marion v. Bryn Mawr Trust Co.*, 288 A.3d 76, 87 (Pa. 2023) ("Indeed, there is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night." (brackets, citation, & internal quotation marks omitted)).

The majority correctly observes that, beginning with *Shaffner*, our jurisprudence has focused chiefly upon two distinctive purposes for other acts evidence under the common plan theory: first, to establish that a defendant had a common plan, scheme, or design in perpetrating the charged criminal offenses; and second, to prove identity where

multiple crimes bear such a unique or distinctive method so as to indicate that they must have been perpetrated by the same individual. It is the former category which must be the focal point in the case *sub judice*, as Appellant's identity is not at issue, given that he concedes that he engaged in sexual relations with all three victims, but claims that they consented to the encounters.

While I agree with the majority that there is a distinction between these two purposes underlying the admissibility of other acts evidence under the common plan, scheme, or design exception to Rule 404(b)'s preclusion of propensity evidence, I find that the crux of this distinction lies in the degree of similarity necessary to render other acts evidence admissible in a given case. Critically, for other acts evidence to be deemed admissible to prove identity under the signature crimes theory, we have always required the charged crimes and the other bad acts to be "so similar that logically the same person has committed both acts." *Rush*, 646 A.2d at 560. Conversely, where, as here, identity is not at issue, other acts evidence may nonetheless remain admissible for the purpose of demonstrating that the defendant exhibited a common plan, scheme, or design in perpetrating his various criminal acts, both charged and uncharged, if there are certain similarities between those acts. Yet, those similarities need not be as unique or striking as the similarities necessary for proving identity.

Ours is not the first Court to consider this distinction between common plan, scheme, or design evidence and signature crime evidence used to prove identity. Indeed, in the seminal case of *People v. Ewoldt*, 867 P.2d 757 (Cal. 1994), the California Supreme Court thoroughly examined the purposes for which other acts evidence is frequently deemed admissible under a common plan, scheme, or design analysis.[7] In *Ewoldt*, the

---

[7] California's relevant evidentiary rule reads:

(continued…)

defendant, Craig Ewoldt, was charged with several sexually-based offenses stemming from sexual abuse he perpetrated against his stepdaughter, Jennifer. At Ewoldt's trial, the prosecution presented evidence that Ewoldt had previously committed lewd sexual acts, which did not result in criminal charges, against Jennifer's older sister, Natalie. A jury convicted Ewoldt of numerous offenses, but California's intermediate court overturned the convictions on appeal, finding that the trial court had erred in allowing the prosecution to present evidence of the uncharged sexual abuse of Natalie.

The California Supreme Court reversed the intermediate court's decision, finding that the other acts evidence at issue was admissible to demonstrate a common plan, scheme, or design undertaken by Ewoldt in committing the charged offenses. In so doing, the court reasoned that "[t]he presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done," *id.* at 764 (quoting 1A Wigmore, Evidence (Tillers rev. ed. 1983) § 102, at 1666), thus rejecting "the

(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness.

Cal. Evid. Code § 1101.

erroneous premise that a common design or plan cannot be established by evidence reflecting that the defendant committed markedly similar acts of misconduct against similar victims under similar circumstances, unless all of these acts are part of a single, continuing conception or plot," *id.* at 767. In this vein, the court opined that other acts evidence used to establish a common plan, scheme, or design "is not admitted to establish that the defendant has a criminal disposition or bad character, but to prove that he or she committed the charged offense *pursuant to the same design or plan* used in committing the uncharged criminal acts." *Id.* at 768 (emphasis added).

Ultimately, the court differentiated between three separate purposes underlying the admission of other acts evidence considered to fall within the purview of the general concept of common plan, scheme, or design, explaining that such evidence may be used to prove (1) intent, (2) common plan or scheme, or (3) identity. In distinguishing these three purposes, the court focused upon the threshold for admissibility in each category. First, the court found that using other acts to prove intent based on similarities between the acts requires "[t]he least degree of similarity []between the uncharged act and the charged offense[,]" as multiple similar occurrences tend to negate the possibility that the conduct in question was inadvertent or accidental. *Id.* at 770. Next, the court elucidated that "[a] greater degree of similarity is required in order to prove the existence of a common design or plan," explaining that, consequently, the evidence of uncharged acts at issue "must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" *Id.* (quoting 2 Wigmore, Evidence (Chadbourn rev. ed. 1979) § 304, at 249). Critically, that plan need not be distinctive or unusual. The court elaborated:

> To establish the existence of a common design or plan, *the common features must indicate the existence of a plan rather*

> *than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.* For example, evidence that a search of the residence of a person suspected of rape produced a written plan to invite the victim to his residence and, once alone, to force her to engage in sexual intercourse would be highly relevant even if the plan lacked originality. In the same manner, evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. *Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense.*

*Id.* (citation omitted; emphasis added). Finally, the court stressed that "[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity," observing that, for evidence to be admissible for this purpose, "the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts." *Id.* (citation omitted). Stated differently, under this final category, "[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." *Id.* (quoting 1 McCormick on Evidence § 190, at 801-03 (4th ed. 1992)).

Returning to the facts of the case before it, the California Supreme Court observed that Ewoldt's charged and uncharged acts bore the following similarities: the victims were his stepdaughters, were of similar age at the time of the sexual abuse, and were residing in Ewoldt's home; Ewoldt molested each victim at night while she was asleep in bed; when questioned by each victim, Ewoldt claimed that he was simply straightening her blankets; and Ewoldt conducted his molestation of the two girls in a similar manner. Based on these similarities, the court found "that evidence of defendant's uncharged misconduct share[d] sufficient common features with the charged offenses to support the inference that both the uncharged misconduct and the charged offenses [were]

manifestations of a common design or plan." *Id.* at 771. As such, the court concluded that the evidence at issue was "relevant to establish that defendant committed the charged offenses in accordance with that plan." *Id.*

One year after the California Supreme Court issued its decision in *Ewoldt*, the Washington Supreme Court relied heavily thereupon in defining the parameters of its own admissibility rules pertaining to other acts evidence for purposes of demonstrating that a defendant acted pursuant to a common plan, scheme, or design. In *State v. Lough*, 889 P.2d 487 (Wash. 1995), the prosecution introduced testimony from several women pertaining to uncharged sexual assaults at the defendant's trial for rape of another woman. Those women, all of whom had been in relationships with the defendant, testified that he surreptitiously slipped drugs into their drinks and then raped them. After the jury convicted the defendant and the lower courts upheld his conviction on appeal, the Washington Supreme Court "accepted review to consider when evidence is admissible under [Washington's Rule] 404(b) for the purpose of proving a common plan or scheme."[8] *Id.* at 490. Reasoning that "crimes or misconduct other than the acts charged may be admitted for a variety of other reasons including the proving of a scheme or plan of which the offense charged is a manifestation," the court posited that, "[w]hen the very doing of the act charged is still to be proved, one of the facts which may be introduced into evidence is the person's design or plan to do it." *Id.* (footnotes omitted).

---

[8] Washington's version of Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Wash. ER 404(b).

Homing in on the word "plan," the Washington Supreme Court found that this exception to Rule 404(b)'s prohibition on propensity evidence applies in two situations: (1) "where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan;" and (2) "when an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes." *Id.* at 491. In finding that both situations render such evidence admissible, the court declined to adopt the alternative viewpoint championed by the defendant that "common scheme or plan evidence under ER 404(b) is admissible *only* if a causal connection exists between the prior acts and the act charged and that the prior act of misconduct must be done in preparation for the charged offense," observing that "so artificial a restriction . . . would often bar relevant and reliable evidence." *Id.* (emphasis original). Invoking the *Ewoldt* court's reasoning, the Washington Supreme Court explained that, "[w]hen a defendant's previous conduct bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design." *Id.* at 494 (citing *Ewoldt*, 867 P.2d at 769-70). With this concept in mind, the court concluded that "[t]he evidence that this [d]efendant rendered four other women, whom he had relationships with, unconscious with drugs and then raped them [was] *not* admitted to establish that the [d]efendant has a criminal disposition or a bad character," but, rather, was "admitted to show that he committed the charged offense pursuant to the same design he used in committing the other four acts of misconduct." *Id.* (emphasis original). In the court's view, the defendant's history of drugging other women and raping them while they were unconscious "evidence[d] a larger design to use his special expertise with drugs to render them unable to refuse consent to sexual intercourse," such that "[a]

rational trier of fact could find that [he] was the mastermind of an overarching plan."[9]  *Id.* at 495.

Several other state and federal courts have adopted an understanding of the use of other acts evidence to show a defendant's common plan, scheme, or design which is similar to, or derivative of, that espoused in *Ewoldt* and *Lough*.  *See, e.g., State v. Big Crow*, 773 N.W.2d 810, 812 (S.D. 2009) ("In interpreting the 'plan' exception in the statute, this Court has followed those authorities allowing other acts not only where the charged and uncharged acts are part of a single, continuing conception or plot, but also where the uncharged misconduct is sufficiently similar to support the inference that they are manifestations of a *common* plan, design or scheme to sexually abuse different victims." (emphasis original)); *State v. McClellan*, 323 S.E.2d 772, 774 (S.C. 1984) (concluding that "[i]t would be difficult to conceive of a common scheme or plan more within the plain meaning of the exception than that presented by this evidence" where the victim and her two sisters testified regarding parallel assaults in which their father, the defendant, first molested them around age 12, entered their room and forced one of them to submit, and quoted the Bible to them to justify his actions); *State v. Eiler*, 762 P.2d 210, 218 (Mont. 1988) (holding that evidence that the defendant had sexually abused his stepdaughter from a previous marriage was admissible at his trial stemming from his rampant sexual abuse of his stepdaughter from a subsequent marriage, as such evidence was indicative of a common plan pursuant to which the defendant "had parental control over each stepdaughter and maintained continual control through threats of punishment" to enact his sexual abuse scheme); *People v. Sabin*, 614 N.W.2d 888, 901 (Mich. 2000) (finding

---

[9] Notably, the court agreed with the trial court's decision to exclude evidence of the defendant's prior acts which did not fall within this preconceived design for raping women, including evidence that he exposed himself to a 12-year-old, raped his sister, and fondled a 15-year-old girl who was an overnight guest at his home.

that evidence pertaining to uncharged incidents of sexual abuse which the defendant committed against his stepdaughter was admissible to prove a common plan or scheme at his trial for the sexual abuse of his daughter because, in light of the similarities between the crimes, "[o]ne could infer . . . that defendant had a system that involved taking advantage of the parent-child relationship, particularly his control over his daughters, to perpetrate abuse"); *Commonwealth v. King*, 441 N.E.2d 248, 252 (Mass. 1982) ("We have held admissible evidence of other crimes for the purpose of showing a common scheme or course of conduct in numerous other cases."); *State v. Hopkins*, 698 A.2d 183, 185 (R.I. 1997) (determining that the trial court did not err in permitting the prosecution to introduce uncharged sexual misconduct evidence to show that the defendant's "sexual molestation of his stepson was part of a common scheme or plan of sexual misconduct that [he] carried out against boys of a similar age at a time when they too, like the stepson, were under [his] thumb"); s*ee also People v. Rath*, 44 P.3d 1033, 1042 (Colo. 2002) (highlighting that admission of other acts evidence "to prove the commission of the guilty act when identity is already conceded does not depend upon distinguishing the defendant from others who also had the capacity and opportunity to commit the crime" by way of a unique signature); *State v. DeJesus*, 953 A.2d 45, 76 (Conn. 2008) (recognizing that "strong public policy reasons continue to exist to admit evidence of uncharged misconduct more liberally in sexual assault cases than in other criminal cases"); *State v. Hartman*, 161 N.E.3d 651, 662 (Ohio 2020) ("There may be instances in which seemingly unrelated but highly similar crimes could be evidence of a common scheme to commit the charged crime—perhaps, for instance, a string of robberies occurring close in time and location. We stress, however, that plan evidence should show that the crime being charged and the other acts are part of the same grand design by the defendant."); *United States v. Parker*, 469 F.2d 884, 890 (10th Cir. 1972) ("If the defendants hired or caused the two

felons to make the forbidden bombs and molotov cocktails–(as the jury found by its verdict)–evidence of their having caused other forbidden destructive devices to be made, without registering or paying the required taxes, and the use of them to 'burn down' or 'blow up' other buildings of defendants' competitors or enemies, would all be evidence of a common scheme or plan.").

My view of the common plan, scheme, and design exception is consistent with Pennsylvania law and comports with that which has been demarcated by the California and Washington Supreme Courts and those courts which have followed suit in defining the admissibility of such evidence under their respective Rule 404(b).  From my perspective, there are several discrete purposes served by evidence of a defendant's other acts which fall under the umbrella of this exception, including, as the majority recognizes, to establish a defendant's identity or, in some instances, to show the steps of a defendant's plan enacted to achieve a goal.  Critically, however, another valid purpose is to demonstrate that the defendant acted pursuant to a common plan, scheme, or design in effectuating multiple, unrelated criminal offenses.  This third category is of paramount importance in a case such as this, in which identity is not contested, but a defendant has committed multiple similar crimes in a manner that demonstrates that he or she has, in essence, created a "criminal playbook" of sorts to achieve a desired result by conforming to a pattern which has proven successful in past criminal episodes.  Indeed, in its *amicus* brief, the Office of the Attorney General ("OAG"), aptly expounds upon this notion, submitting:

> It is certainly true that some criminal schemes may involve a linked series of preconceived crimes, but most do not.  Crime is often an act of opportunity.  A criminal plan may thus be likened to a script or playbook of criminal tactics that worked for an offender when committing past crimes.  To account for such real-world conditions, the concept of "plan" should

> logically include an offender's opportunistic resort to criminal techniques that succeeded for him previously.

OAG's Brief at 15.

Here, while Appellant's three rape cases do not meet the majority's unnecessarily narrow understanding of the common plan, scheme, or design exception, as Appellant did not commit each individual rape as steps of a single plan intended to result in a single goal, the three criminal offenses clearly fall within the broader interpretation of the exception adopted by numerous other courts and amply supported by our jurisprudence. Plainly, Appellant appears to have adopted a standard scheme to enable him to victimize women, under which he loiters on the streets of Philadelphia, opportunistically seeking women whom he perceives to be vulnerable (for example, recovering drug-users or women who are in locations unfamiliar to them), whom he then lures to abandoned and unpopulated areas, where he forcibly rapes them. This, to me, is certainly indicative that Appellant was acting pursuant to a common plan, scheme, or design.

Critically, under the majority's newly-established standard, a defendant's other sexual assaults would virtually never be admissible in a trial for another charged sexual offense under the common plan, scheme, or design exception, unless offered under the signature crime theory to prove identity. I struggle to conceive of a scenario in which multiple sexual offenses would fall within the majority's narrow definition of plan, which essentially distills to an ongoing series of incidents or actions which a defendant perpetrates to reach a single end goal. Indubitably, a defendant's goal in committing a rape or other sexually-based offense is limited to completion of that act itself, without consideration of any future contemplated rapes or sexual assaults, particularly in cases such as this, where a defendant opportunistically commits such crimes while employing familiar tactics to achieve his end goal of victimizing a complete stranger. This

shortcoming also is apparent when considering other types of offenses, such as opportunistic theft, burglary, or robbery.

Consider the following hypothetical: A defendant who is a plumber commits multiple thefts by unlawful taking, stealing items from clients' bathrooms while left unsupervised therein to do his work. Several clients file police reports accusing the defendant of committing these thefts, but the defendant claims that the clients gave him the stolen items in lieu of payment. Under the majority's new standard governing admissibility of other acts evidence to show common plan, scheme, or design, these cases would not be admissible at the trials for the other offenses and, thus, could not be consolidated to show that the defendant enacted a scheme to successfully steal items from his clients, relegating each individual case to little more than a "he said/she said." Despite similarities in the defendant's commission of each individual theft perpetrated pursuant to an overarching playbook, these cases would not be subject to consolidation based on Rule 404(b) because they were not part of one plan bearing a single end goal, but, rather, were committed to achieve individual ends (*i.e.*, stealing valuables from a given home), without consideration of the future crimes which the defendant would ultimately commit. To me, this result is unjust and runs afoul of the purposes of both Rule 582 and Rule 404(b), as does the Court's end result in the case *sub judice*.

Perhaps a real-world example may be even more illustrative of the unjustness of the majority's new rule. In *Ewoldt, supra*, the California Supreme Court overturned its prior decision in *People v. Ogunmola*, 701 P.2d 1173 (Cal. 1985), finding that the reasoning espoused therein was inherently flawed. The court explained:

> The defendant in that case, a gynecologist, was convicted of raping two patients in the course of conducting pelvic examinations. Two other patients testified that the defendant had raped them in the same manner. In each instance, the crime was alleged to have occurred while the "victim was lying on her back on an examination table with her knees bent and

her feet in stirrups. A paper drape covered her knees, blocking her vision of all but defendant's head and chest. Each testified that the nurse left the room after defendant had obtained a pap smear and before the bimanual examination." This court concluded the challenged evidence was inadmissible, because neither the identity of the alleged perpetrator, nor his intent, was in issue.

*Id.* at 768 (internal citations & footnotes omitted). In rejecting its prior ruling, the court reasoned:

It is difficult to imagine a stronger example of separate crimes, committed pursuant to a common design or plan, than the offenses involved in *Ogunmola*. The marked similarity between the uncharged criminal acts and the charged offenses constituted strong circumstantial evidence that the defendant had developed a plan to engage in sexual intercourse with his patients without their consent and in the unusual manner described.

*Id.* Under the majority's "single plan" standard, justice would not be served if we were to encounter this — or any remotely similar — factual scenario. As such, I find this narrow and unyielding standard, which represents a stark departure from our prior decisions over the last century and a half, to be unjust and shortsighted, as it portends to write the exception out of the rule.

Relatedly, in the context of consolidation, the "single plan" requirement for other acts evidence admitted under Rule 404(b)'s common plan, scheme, or design exception suffers from additional shortcomings. First, the majority's narrow standard renders the language of Pa.R.Crim.P. 582(A)(1)(b) (permitting consolidation where "the offenses charged are based on the same act or transaction") superfluous. The majority's hypothetical scenario proffered to demonstrate the application of its standard reveals this deficiency. Specifically, the majority states:

Consider, for example, a defendant who robs a bank. During his getaway, he leads police on a highspeed chase and hits a pedestrian. He initially escapes and breaks into a home to lie

> low. A few days later, he steals a car before he is arrested. Under the common plan or scheme exception, each of the defendant's crimes (robbery, assault, burglary, and theft) would be admissible in a trial for the others, as they were all committed in furtherance of a common goal — to rob the bank and escape with the proceeds.

Majority Opinion at 33-34. The various criminal acts included in this hypothetical would undoubtedly be subject to consolidation for a single trial under Rule 582(A)(1)(b), as the robbery, assault, burglary, and theft were committed during a single criminal transaction, thus rendering the "single plan" theory of admission pursuant to the common plan, scheme, or design exception to Rule 404(b)'s bar on propensity evidence irrelevant for purposes of consolidation under Rule 582(A)(1)(a). *See Commonwealth v. Wholaver*, 989 A.2d 883, 899 (Pa. 2010) (finding that consolidation was proper under Rule 582(A)(1)(b) for sexual offenses which the defendant committed against his daughters and charges for murder based on defendant's fatal shooting of his wife and daughters "because the charges all flowed from the same events and were part of the same story"); *Commonwealth v. DeHart*, 516 A.2d 656, 661 (Pa. 1986) (determining that consolidation of escape, homicide, robbery, and burglary charges was proper where the latter three offenses were all committed as part and parcel of the defendant's initial escape from prison, thus constituting "the same criminal episode").

In a similar vein, the majority's new standard also encroaches upon another exception to Rule 404(b)'s prohibition against admissibility of propensity evidence — specifically, the *res gestae* exception, under which "evidence of other criminal acts is admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988) (citations & internal quotation marks omitted). The evidence of each crime delineated in the majority's hypothetical would seemingly be admissible under this exception to the rule against propensity evidence, again rendering its "single plan"

standard for the common plan, scheme, and design exception duplicative of existing means for admitting other acts evidence. *See Commonwealth v. Mayhue*, 639 A.2d 421, 435 (Pa. 1994) (finding that evidence that the defendant helped to murder the person whom he had paid to kill his wife, but who failed to do so, was admissible at the defendant's trial for murdering his wife because it was "essential to complete the story behind [her] death"); *Commonwealth v. Brown*, 342 A.2d 84, 90 (Pa. 1975) (concluding that evidence pertaining to robbery, rape, and attempted murder was admissible at the defendant's murder trial, as the multitude of crimes "were part and parcel of the violent rampage which resulted in the [victim's] death . . . [and] were necessary to complete the picture of the day in question"); *see also generally Commonwealth v. Paddy*, 800 A.2d 294, 307-08 (Pa. 2002).

Hence, in light of the foregoing, I cannot join in the majority's deprecation of our long-employed standard for the admissibility of other acts evidence under the common plan, scheme, or design exception to Rule 404(b)'s prohibition on the use of propensity evidence. Instead, I would reiterate that other acts evidence may be admissible to demonstrate that a defendant has acted pursuant to an overarching plan or scheme to achieve results in a manner successfully utilized by him to reach an end goal in the past where charged and uncharged acts bear sufficient similarities, albeit without requiring as weighty of parallels as is needed to establish identity. Furthermore, I would hold that, here, this standard has been met, as the evidence shows that Appellant repeatedly acted pursuant to a common plan or scheme, under which he loitered on the streets of Philadelphia and near public establishments, sought out women he perceived to be vulnerable, lured them to deserted locations, and violently raped them. More precisely, in that final regard, the evidence demonstrated that: with respect to P.C., Appellant demanded that she drop to her knees, pushed her to the ground, punched her in the face,

attempted to force his penis into her mouth, grabbed her by the shirt and slammed her onto the hood of a car, pulled down her pants, and forced his penis into her vagina; with respect to T.A., Appellant put a knife to her neck, pushed her to the ground, forced her to perform oral sex on him, and vaginally raped her while pressing her against a metal fence; and with respect to B.H., Appellant put a hand over her mouth from behind, pushed her to the ground, struck her in the back with a tire iron, pulled her pants down, and forcibly penetrated her vagina with his penis. Thus, in my view, and contrary to the Court's conclusion, Appellant is not entitled to a new trial based on the trial court's consolidation of the three cases.

### III. Confrontation Clause

With respect to the second basis on which we granted review in this case, the majority concludes that the prosecution violated Appellant's constitutional Confrontation Clause rights by admitting rape kit reports concerning two of the victims into evidence without requiring testimony from the nurse examiners who created the reports, opining that the "primary purpose" of those reports when created "was to provide evidence for a (potential) later criminal prosecution." Majority Opinion at 53. Hence, the majority finds that Appellant is likewise entitled to relief in the form of a new trial based on his contention that the use of the rape kit reports without testimony from the nurse examiners who prepared them violates his rights under the Confrontation Clause. Once more, I must disagree with this conclusion.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Two years ago, in *Commonwealth v. Weeden*, our Court thoroughly examined the historical underpinnings of the Confrontation Clause as evinced from the United States Supreme

Court's decisions involving the provision over the past 21 years. 304 A.3d 333, 345 (Pa. 2023) ("In the past two decades, the high Court has grappled with the intended scope of the Confrontation Clause in a bevy of cases relevant to our current inquiry, placing a paramount focus on the purpose for which a statement was made in discerning whether a statement is testimonial and, thus, invokes the Clause's protections."). *Weeden* provides a comprehensive overview of the high Court's relevant jurisprudence interpreting and applying the Confrontation Clause, as well as a summary of our own jurisprudence on the topic; thus, I will not presently undertake a similarly expansive recounting of such case law.

Briefly, however, I note that the high Court draws a significant distinction between evidence which is testimonial in nature and that which is not. *See Davis v. Washington*, 547 U.S. 813, 822 (2006) (explaining, in the context of a police interrogation, that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency;" and that, conversely, statements are testimonial "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"). In *Davis*, the Supreme Court concluded that statements made to a 911 operator by a woman who was amidst a brutal domestic violence incident were nontestimonial because the statements were made to describe current circumstances for purposes of obtaining police assistance, rather than to "establish or prove some past fact." *Id.* at 827 (brackets & internal quotation marks omitted). At the same time, the Court held that statements made by a different woman during a police interrogation following her report of a domestic violence incident were indeed testimonial, as those statements were "part of an investigation into possibly

criminal past conduct," given that no emergency was ongoing at that time and police sought to determine what had happened. *Id.* at 829-30. In this regard, the latter scenario evinced that "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime," such that the woman's statements to police constituted little more than "an obvious substitute for live testimony," which would not be admissible absent her appearance at trial. *Id.* at 830.

Similarly, the high Court has distinguished between testimonial and nontestimonial statements contained in documents. Specifically, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Court determined that the Confrontation Clause did not permit the prosecution to introduce affidavits into evidence without proffering the testimony of the individuals who certified them, as the documents were "functionally identical to live, in-court testimony." *Id.* at 310-11. In that regard, the Court observed that the affidavits were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," thus demonstrating their testimonial nature. *Id.* at 311. Likewise, in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the high Court found that the prosecution violated the defendant's rights under the Confrontation Clause by introducing into evidence a forensic laboratory report via a scientist who did not sign the certification attached thereto. The Court explained that, under such circumstances, the scientist's testimony amounted to "surrogate testimony" which did not meet the constitutional threshold, given that the defendant had the right "to be confronted with the analyst who made the certification, unless that analyst [was] unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.* at 652.

Most recently, in 2024, the Supreme Court briefly reiterated that, in determining whether evidence is testimonial, the focus must be "on the 'primary purpose' of the

statement, and in particular on how it relates to a future criminal proceeding." *Smith v. Arizona*, 602 U.S. 779, 800 (2024). While the issue before the Court in *Smith* did not revolve around whether the evidence proffered at the defendant's trial was testimonial, the high Court nonetheless provided some general guidelines with respect to the primary purpose test. Specifically, the Court highlighted that, in examining the evidence in question, a court should consider precisely which statements are at issue and, for laboratory reports or the like, "should consider the range of recordkeeping activities that lab analysts engage in," as "some records of lab analysts will not have an evidentiary purpose." *Id.* at 802.

Although this Court has not heretofore had the opportunity to consider a Confrontation Clause challenge under the primary purpose test since the Supreme Court issued *Smith*, we have regularly employed the Court's prior jurisprudence in resolving such challenges. As noted, in 2023, we issued *Weeden*, *supra*, in which we concluded that a report contemporaneously created by an electronic system that captures audio for purposes of identifying potential gunshots was "nontestimonial in nature under the high Court's primary purpose test," as the report was generated "in an effort to assist law enforcement in responding to an ongoing emergency." *Weeden*, 304 A.3d at 350 (footnotes omitted). Similarly, in *Commonwealth v. Dyarman*, 73 A.3d 565 (Pa. 2013), we concluded that accuracy and calibration certificates for breathalyzer testing machines were nontestimonial in nature because the certificates were not created "for the primary purpose of providing evidence in a criminal case." *Id.* at 569. However, we reached the opposite conclusion in *Commonwealth v. Yohe*, 79 A.3d 520, 537 (Pa. 2013) (holding that a toxicology report was testimonial under the Confrontation Clause, as it addressed the main fact of whether the defendant had driven while intoxicated by identifying the alcohol content of his blood, thus "serving the identical function of live, in-court testimony" (citation

omitted)), and *Commonwealth v. Brown*, 185 A.3d 316, 329 (Pa. 2018) (finding that an autopsy report was testimonial in nature because it was created pursuant to a statute which essentially identified as its primary purpose "determine[ing] whether the death occurred as the result of a criminal act" (citing 35 P.S. § 450.503; 16 P.S. § 1237)).

Returning to the facts of the case *sub judice*, I disagree with the majority's conclusion that the rape kit reports admitted into evidence at Appellant's trial were created for the primary purpose of "provid[ing] evidence for a (potential) later criminal prosecution." Majority Opinion at 53. From my perspective, although the examination reports *may* be used in litigation of rape and sexual assault cases, that is not the *primary purpose* underlying their creation. Indeed, as Allison Denman — PSARC's Clinical Director who also serves as a sexual assault nurse examiner — testified, rape kit reports are created by PSARC nurses while examining victims for the primary purpose of aiding medical personnel in identifying injuries, and providing medical treatment, testing, and emergency contraception. This purpose is fully on display in the fact that a victim of sexual assault who presents to PSARC for treatment receives identical care regardless of whether she files a police report or not. Simply because rape kit reports may also be a useful tool for the prosecution in a future criminal case does not alter this primary purpose. Furthermore, the rape kit reports are similar to the ShotSpotter reports that we deemed nontestimonial in *Weeden*, *supra*, which are generated for purposes of identifying gunshots to aid law enforcement, but may also be used by the prosecution in subsequent litigation. Accordingly, in my view, the trial court did not violate Appellant's right to confrontation by permitting the Commonwealth to introduce the reports without proffering the testimony of the nurses who created them.[10]

---

[10] Relatedly, I find no merit to Appellant's contention that the reports constituted hearsay, as the defense stipulated that the reports were medical records kept in the regular course of business. In any event, even without that stipulation, Denman's testimony wholly (continued…)

For these reasons, I would affirm the decision of the Superior Court and Appellant's judgment of sentence.  Thus, I respectfully dissent.

Justices Mundy and Brobson join this dissenting opinion.

---

established that the reports fell within both the medical records and business records exceptions to the rule against hearsay.