## Shaffner *versus* The Commonwealth.

1. As a general rule, a distinct crime unconnected with that in the indictment, cannot be given in evidence against the defendant.

2. That one crime may be evidence of another, there must have been a connection between them in the mind of the criminal or the person must be so identified as to show that one committed both.

3. Should the judge not clearly see the connection, the defendant should have the benefit of the doubt, and the jury not be prejudiced by an independent fact, not evidence of the particular guilt.

4. Defendant was indicted for murdering his wife by poison, there was evidence of his criminal intimacy with the wife of another man, on whose life was an insurance, the proceeds of which on his death the defendant endeavored to procure. *Held*, that evidence that the husband died with the same symptoms as defendant's wife, and that he had been attended by the defendant, was inadmissible.

5. The judge below charged: "If the prisoner is guilty, there can be no difficulty in ascertaining the degree, for being by poison, it must be in the first degree if purposely administered: * * * if you are convinced that he is guilty of the crime, it is murder in the first degree as declared by the Act of Assembly, and it is your duty to say so without regard to the consequences to the prisoner." *Held*, not to be error.

6. If a charge is imperative, taking from the jury the right of deciding the *degree* of murder, it is error.

[Shaffner v. Commonwealth.]

7. It is the duty of the judge to inform the jury the degree fixed by law to murder by poison, and to instruct them as to *their* duty.

8. Lane *v.* Commonwealth, 9 P. F. Smith 371 ; Rhodes *v.* Commonwealth, 12 Wright 396, distinguished.

May 20th 1872. Before THOMPSON, C. J., AGNEW, SHARS-WOOD and WILLIAMS, JJ.

Error to the Court of Oyer and Terminer of *Dauphin county :* Of May Term 1872. No. 73.

At the November Sessions 1871, of the Court of Oyer and Terminer of Dauphin county ; Emanuel Shaffner was indicted for the murder of his wife, Nancy Shaffner, by poison.

The indictment was tried March 4th 1872, before Pearson, P. J., and his associates.

The deceased died on Sunday, June 11th 1871. The evidence tended to show that she died by poison, and the principal question was whether the poison had been administered by her husband Emanuel Shaffner, the defendant. There was evidence of improper intimacy between. the defendant and one Susan Cassell, afterwards Susan Sharlock.

The Commonwealth gave evidence of the symptoms attending the death of Nancy Shaffner ; and that Sarah Shaffner, the first wife of defendant, who died in October 1869, and John Sharlock, the husband of Susan Sharlock, both died at the house of the defendant with similar symptoms.

After evidence bearing on the foregoing points had been given, the Commonwealth called Samuel Seabold, agent of a life insurance company, who testified that he insured John Sharlock's life, November 11th 1870, for $2000, in favor of his wife, Susan Sharlock ; about three months afterwards Sharlock died ; on the second day after his burial, Shaffner came to the house of witness to see about the insurance. He described to the witness the symptoms of Sharlock's sickness and the circumstances of his death. Witness told Shaffner he must bring the widow ; Shaffner brought her shortly afterwards to witness and had the proof as to Sharlock's death made ; witness asked him how his wife liked his taking Mrs. Sharlock about in that way ; Shaffner said she did not like it at all ; said if the proof was not sufficient, witness was to write to him ; the proof was not sufficient, and it was made out again ; defendant came again for the insurance-money ; witness said he could not have it, that he must bring the widow ; he brought her and witness paid her the money ; she gave it to Shaffner.

The foregoing evidence was admitted under objection and exception, Judge Pearson saying, that it was offered as declarations of the defendant to show his *intimate relations* with Susan Sharlock, being followed with his acts with her and endeavors to get the insurance-money for her.

E. Hubbard testified that Sharlock owed him money, Shaffner

[Shaffner *v.* Commonwealth.]

said *he* would pay it; he was to settle the estate; he was receiving $2000 insurance-money; it was better for her than a man.

There was evidence of Shaffner's efforts to have the administration of Sharlock's estate, that it had been granted to him, &c.

The evidence tended to show defendant's criminal intercourse with Susan Sharlock before her marriage, and during the lives of both the defendant's wives; that Susan lived in the family of the defendant both before her marriage and afterwards with her husband.

There was evidence of declarations by the defendant, that the symptoms of his two wives and of Sharlock at the time of their deaths were all different from each other.

The Commonwealth then offered to show that the death of the defendant's first wife, September 4th 1869, and that of John Sharlock, February 17th 1871, were from the same cause, poison, that they had the same symptoms as Nancy, the last wife who died June 11th 1871; that the defendant was the attendant of each and that they all died at his house;—

1. To negative what the prisoner said of the deaths being dissimilar, using it as an argument to meet the allegations that Nancy died from poison taken by herself.

2. The bearing of the deaths and their causes on the question of motive.

3. To disprove any inference that Nancy died from poison by accident or suicide.

4. That the deaths are so connected that they form one chain of facts which cannot be ascertained without rendering part of the evidence received unintelligible, incomplete and imperfect.

Objected to by defendant.

The court rejected the part of the offer relating to the first wife's death; but as to the other part said:—

"The evidence proposed as to the death of John Sharlock stands on a different footing. We have heard testimony tending to show that his wife and Shaffner—the prisoner—had for a considerable time carried on a criminal connection. That the first wife had sent Susan away—probably on account of jealousy. Immediately after her death Susan returned, lived with Shaffner until he married again, and was soon after sent off by the second wife. She married Sharlock, and returned to Shaffner's to live. Her husband had his life insured for $2000 in favor of his wife. Soon after the man died, and the day after the funeral Shaffner applied for the insurance-money. Ultimately obtained it for Susan, wished to borrow it, but failed. Four months after Sharlock's death the prisoner's wife Nancy died in the manner detailed. As soon as she had departed, and before the funeral, Susan returned there to live, and continued to reside with the prisoner until two days before he was arrested, which was some time after the disinterment of Nancy, and the analysis of her viscera. The motive suggested

[Shaffner *v.* Commonwealth.]

for removing Sharlock is that Shaffner might get the life insurance, and as soon as his own wife was out of the way might also get Susan. These things tend to show the *quo animo* or motive for doing the act, and also to prove that in point of motive the two murders, if committed, were connected. The Commonwealth is entitled, as the case now stands, to give the death of John Sharlock, with the attendant circumstances, in evidence. This, independently of the defendant's declaration to several that the deaths of all three of these persons were alike, and to others that they were entirely different. At the same time we are bound to instruct the jury that if they do not believe that a criminal intercourse was carried on between Susan and Shaffner, they must reject all of the evidence relative to Sharlock's death. Its admissibility depends on that fact."

The defendant excepted to this ruling and a bill of exceptions was sealed.

On the evidence received under this bill of exceptions the court in the general charge instructed the jury : " We now come to the question of Sharlock's death ; and here I must caution you in advance that the death of Sharlock was not received for the purpose of showing that the prisoner poisoned his wife because he had committed some other crime. We could not lawfully receive it for that purpose. The perpetration of one offence cannot be proved by showing that the party had committed another. You were not in when the decision was made ; we declined receiving any evidence in regard to the first wife's death and the cause thereof, because it would have been improper. It would be equally improper to receive evidence of the manner of Sharlock's death for the mere purpose of showing that another death had happened in the prisoner's house in the same way and was caused by poison. It is received in connection with what is said in regard to Susan. Susan was the wife of Sharlock, and had a policy of $2000 upon his life, and the evidence is admitted for the purpose of showing a motive on the part of the prisoner to act as it is said he did, and that motive depends entirely on the course of his life in connection with Susan. If there had been no improper intimacy between them, Sharlock's death ought not to weigh at all in the present case, although you might believe that he died from poison, and that it was administered by the prisoner. We cannot permit evidence to be given of one crime in order to prove another. If there is that chain of circumstances running through the case that would show the prisoner's anxiety to have Susan free from the embarrassment of a husband, and obtain for her $2000 from the life insurance, then we have it followed four months after by the death of Mrs. Shaffner. You must be satisfied that both deaths were prompted by the same motive. It has been suggested, ' Why take the life of Sharlock before that of the wife ?' If the intention of the prisoner was to carry out a scheme by which the insurance-money

[Shaffner *v.* Commonwealth.]

could be obtained, and Susan obtained it, it mattered very little which point they started, whether it was commenced by the destruction of Sharlock or that of the prisoner's wife. It would not do to have them come too close together for fear of exciting suspicion. We must not act, however, on suspicion, but upon nothing but clear conviction."

There was evidence of other circumstances tending to show the guilt of the defendant.

The court charged: * * * "It is made the duty of the jury before whom the person is indicted, to ascertain the degree of guilt in cases of conviction. [In the present case, if the prisoner is guilty at all, there can be no difficulty in ascertaining the degree of guilt, for, being by poison, it must necessarily be murder of the first degree, if purposely administered. * * * If your mind and judgment are convinced beyond any reasonable doubt that he is guilty of the crime, it is a high and heinous one, is murder of the first degree, as declared by the Act of Assembly, and it is your duty to say so, without the slightest regard to the consequences to the prisoner."]

To understand the points decided by the Supreme Court does not require a more extended statement of the case.

The jury found the defendant guilty of murder in the first degree. After overruling a motion for a new trial, and in arrest of judgment, the Court of Oyer and Terminer, on the 28th of March 1872, sentenced the defendant to be hung. He removed the record to the Supreme Court by writ of error, and there assigned seven errors.

Those considered by the Supreme Court, related to the admission of the evidence objected to by the defendant, and the part of the charge given above.

*A. J. Herr* and *Hamilton Alricks* (with whom was *R. A. Lamberton*), for plaintiff in error.—The admission of the evidence as to Shaffner's death required the defendant to meet a charge for which he was not indicted, and to defend two distinct charges in one trial. Evidence of the commission of one crime is not admissible to prove another: Commonwealth *v.* Ferrigan, 8 Wright 387; Stone *v.* State, 4 Humphreys 27; State *v.* Wisdom, 8 Porter 511; Rex *v.* Ellis, 2 Russell 698; Rex *v.* Birdseye, 4 C. & P. 386; United States *v.* Mitchell, 2 Dallas 357; 1 Greenl. Ev., sect. 52, 1 Phillips Ev. 645, and note; 1 Chitty's Cr. Law 564; Roscoe's Crim. Ev. 70. As to the charge of the court: Lane *v.* Commonwealth, 9 P. F. Smith 371; Rhodes *v.* Commonwealth, 12 Wright 396.

*J. M. Wiestling*, District-Attorney, and *W. MacVeagh* (with whom was *S. H. Alleman*), for Commonwea'th.—The evidence

[Shaffner *v.* Commonwealth.]

connecting Susan and John Sharlock with the defendant tended to show his motive: 2 Russell on Crimes 774 et seq. to 779; and this is not affected by the fact that it proved another offence for which defendant might be indicted: Roscoe's Crim. Ev. 86; 1 Phillips on Ev. 767; 1 Whart. Crim. L., sects. 647–649; Heath's Case, 1 Harrison 507; Dunn *v.* State, 2 Arkansas Rep. 244; Roscoe's Crim. Ev. 93; Reg *v.* Garner, 4 Foster & Finlason 346.

The opinion of the court was delivered, July 3d 1872, by

AGNEW, J.—It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. Logically, the commission of an independent offence is not proof, in itself, of the commission of another crime. Yet it cannot be said to be without influence on the mind, for certainly, if one be shown to be guilty of another crime equally heinous, it will prompt a more ready belief, that he might have committed the one with which he is charged; it therefore predisposes the mind of the juror to believe the prisoner guilty. To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other. Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to burthen a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offences charged against him, of which, if fairly tried, he might acquit himself. From the nature and prejudicial character of such evidence, it is obvious it should not be received, unless the mind plainly perceives that the commission of the one tends, by a visible connection, to prove the commission of the other by the prisoner. If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt.

We come now to the offer of evidence received by the court. Leaving out that part relating to the prisoner's first wife, which the court rejected as too remote, the offer was to prove that John Sharlock died from poison, the same kind of which Nancy, the prisoner's wife, died; that his symptoms were the same as hers, that the prisoner attended upon both, and that both died at the

22 P. F. SMITH—5

[Shaffner *v.* Commonwealth.]

prisoner's house; Sharlock on the 17th of February 1871, and Nancy, the wife, on the 11th of June 1871. In substance, this was an offer to show that the prisoner poisoned Sharlock, as evidence that he also poisoned his own wife. The purpose insisted on, was to show a motive on the part of the prisoner for taking the life of his wife, and that the deaths were so connected that they formed one chain of facts, which could not be ascertained without rendering part of the evidence received unintelligible and incomplete. It is argued that the motive of the prisoner for taking the life of Nancy his wife, was to enable him to obtain her money; and to enable him also to marry Susan, the wife of John Sharlock, who had been the prisoner's paramour, as the means of obtaining her money, which was in the form of an insurance policy, on the life of her husband, John Sharlock, and that in order to carry out this plan, it was necessary first to put Sharlock out of the way.

It is obvious that to connect together the deaths of Sharlock and Nancy, and make the former bear upon the latter, they must have been both contemplated by the prisoner as parts of one plan in his mind, in which the taking of Sharlock's life was part of his purpose of taking the life of Nancy. He must, therefore, have contemplated the death of Nancy before taking the life of Sharlock. In order to let in the poisoning of Sharlock, the judge must have had before his mind some fact or facts exhibiting this pre-existing determination to take Nancy's life. Herein the evidence was defective. Let us examine the question of probable motive, and first as to the money of Nancy his wife. Now clearly it was not necessary to put Sharlock out of the way to obtain *it*. Sharlock's death opened no door to reach it. Nancy's death alone would bring it. The evidence was, therefore, inadmissible on this score. Then there was the prisoner's illicit intercourse with Susan Sharlock. This was made the turning-point of the admission of the evidence by the court. But there was no evidence that the prisoner at any time contemplated marriage with Susan, from which such an intent can fairly be inferred to have existed before Sharlock's death; yet this is the essential fact to make it probable, that the prisoner took Sharlock's life, as preparatory to taking Nancy's life, and as the means of enabling him to marry Susan. According to the evidence, the libidinous intercourse between him and Susan existed for years, during the lives of both his wives, without restraint, and Susan continued in his family after his marriage with Nancy, and her own marriage with John Sharlock. Nor was desire of the enjoyment of Susan, so long sated at pleasure, curbed by any new impediment, to make it a ruling motive; while the evidence also shows, that after the prisoner's first wife's death he purposely passed by Susan, when she was single, to marry Nancy, the second wife. Now the meretricious intercourse

[Shaffner *v.* Commonwealth.]

with Susan having existed so long, and when he could have gotten her, having left her to marry Nancy, and the opportunity of enjoying her still continuing, it is not a reasonable or probable presumption that the idea of marrying Susan was in the prisoner's mind when he poisoned Sharlock, nearly four months before he poisoned his wife, so as to constitute a ruling motive to take the lives of both Sharlock and Nancy, as the means of marrying Susan.

Then we come to the pecuniary motive, viz., of obtaining Susan's money. If the prisoner had been on his trial for the murder of Sharlock, his desire to obtain the policy-money dependent on Sharlock's death, would constitute a motive for taking his life; but the question here being upon the probable motive for taking Nancy's life, the inquiry is, what probable connection existed in the design of the prisoner to make Sharlock's death preliminary to that of Nancy? Let it be supposed that the purpose of the prisoner in taking the life of Sharlock, was to enable him to obtain Susan's policy-money, yet it was not a necessary consequence that the prisoner deemed it essential to his plan that he should also take his own wife's life. It is evident these two purposes cannot be linked together, unless the prisoner considered his marriage with Susan necessary to obtain her money. Marriage with Susan must then have been a pre-existing intent, inducing him to frame in his mind the plan of taking the lives of both Sharlock and Nancy, to enable him to marry Susan and thus to obtain her money. But here the evidence fails to furnish the wanting link. There was no evidence, as we have seen, of any design to marry Susan, while it also appears that the prisoner had no cause to doubt his power to obtain possession of Susan's money, in order to make marriage a ruling motive. On the contrary, the evidence shows that instantly on Sharlock's death the prisoner took the steps to obtain the policy-money, and soon accomplished the purpose. The agent of the Insurance Company states, that when the money was paid to Susan she handed it to the prisoner, who put it into his pocket; and we find that afterwards he spoke of still having it, and offered to pay a debt for Susan. It might be, if the prisoner found that Susan would not part with her money after she got it, he then formed the design of marrying her to get it, and as the means of doing so then resolved to kill his wife. But this comes too late, for unless this purpose was present to his mind before he took Sharlock's life, it could not constitute a motive and part of his plan to take his wife's life also, so as to link the two deaths together. But in order to be present to his mind before Sharlock's life was taken, he must have previously known or believed, or must have plainly foreseen he could not avail himself of Susan's money without marrying her, and concluded to marry her, a fact unsupported by any evidence. The previous purpose to marry Susan is

[Shaffner *v.* Commonwealth.]

the broken link in the chain to complete the connection, without which the deaths of both are not so probably connected, as to make Sharlock's death evidence on the trial for the death of Nancy. It was therefore unjust to the prisoner to compel him, on his trial for the murder of his wife, to defend himself against the charge of murdering Sharlock. The offer should have been rejected.

The other errors assigned to the charge are not sustained. It is contended, and earnestly pressed upon us, that the judge had no right to say to the jury that if the prisoner was guilty of murder, it was murder in the first degree, and it was their duty to say so regardless of consequences. The indictment charged a murder by poison, and such was the tendency of the evidence. It was not only the right but the duty of the judge to inform the jury of the degree which the law attaches to murder by poison, and to instruct them in their duty under the law. It is only when the charge becomes imperative, and takes from the jury the right of deciding and pronouncing the degree of the murder, that we have held it to be error. When left free, as in this case they were, to decide the degree for themselves, we have not held it to be error to impress upon their minds the legal inference from the facts, and their duty to obey the law. But when, as in Rhodes *v.* Commonwealth, 12 Wright 396, and Lane *v.* Commonwealth, 9 P. F. Smith 371, a court addresses a jury authoritatively, and requires of them a verdict of murder in the first degree, it is error. Jurors uninstructed in their rights in a capital case, may feel themselves constrained by the peremptory direction of the judge. Both the cases referred to stood upon the same ground, and in both the error was the binding instruction of the court. The language in this case approaches closely the boundary line of peremptoriness, but we cannot say it overstepped it, in view of those parts of the charge which left them free to act for themselves. Jurors are so apt to lean away from a verdict of murder in the first degree, we must not scan too critically the language of the judge, if he has left them free to find the degree of the murder, on the evidence. None of the other assignments of error require notice. The sentence of the Court of Oyer and Terminer is reversed, and a *venire facias de novo* is awarded, and the record is ordered to be remitted for a new trial.