J-S16036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| GEORGE W. WAKELEY, JR. | : | |
| | : | |
| Appellant | : | No. 1118 MDA 2024 |

Appeal from the Judgment of Sentence Entered June 26, 2024
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0000736-2023

BEFORE:    LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: APRIL 28, 2026**

This appeal returns to this panel after remand from the Pennsylvania Supreme Court for reconsideration in light of its recent decision in **Commonwealth v. Walker**, 350 A.3d 54 (Pa. 2026).  George W. Wakeley, Jr. ("Wakeley"), has appealed from the judgment of sentence imposed following his jury convictions of involuntary deviate sexual intercourse with a child[1] ("IDSI") and related offenses.  After careful review, we reverse the conviction of one of the counts of IDSI, vacate the judgment of sentence imposed at that count, and affirm the remaining convictions and judgment of sentence.

As we write for the trial court and the parties, who are well familiar with this matter, we need not repeat the entirety of the underlying facts and

---

[1] **See** 18 Pa.C.S.A. § 3123(b).

procedural history. Nevertheless, to address the issues remanded by the Pennsylvania Supreme Court, we reiterate the following. In 2004, Wakeley began a romantic relationship with Wendy Stout ("Stout").[2] Four or five months later, Stout and her three sons, D.J., L.J., and K.J. (collectively, the "Victims"), then approximately eight, six, and four years old, respectively, moved into Wakeley's home. From 2004 to 2008, Wakeley engaged in numerous acts of sexual abuse against the Victims. In 2022, the Commonwealth charged Wakeley with, *inter alia*, multiple counts of IDSI, indecent assault of a person less than thirteen years of age ("indecent assault"), and corruption of minors.[3]

The Commonwealth filed pre-trial notice pursuant to Pa.R.E. 404(b), of its intent to introduce testimony from two additional minor victims of Wakeley's sexual abuse, including S.Q. The Commonwealth argued this evidence demonstrated that Wakeley engaged in a common scheme, plan, or design of sexually assaulting young children. Wakeley filed a motion *in limine*: (1) objecting to this evidence; and furthermore, (2) seeking to exclude any testimony that his relationship with Stout "deteriorated sexually and physically, and that he compelled her to engage in sexual encounters with other men through Craigslist for money." Motion *in Limine*, 3/13/24, at ¶ 3.

---

[2] At trial, Stout testified that she and Wakeley were married, but she did not say when. ***See*** N.T., 3/18/24, at 94.

[3] ***See*** 18 Pa.C.S.A. §§ 3126(a)(7), 6301(a)(1).

- 2 -

The trial court granted Wakeley's motion to exclude the testimony of one prior victim, but denied the motion as to S.Q. The court denied Wakeley's request to exclude testimony related to his sexual relationship with Stout "in so far as the testimony relate[d] to circumstances in the home [that the Victims] observed" and "relate[d] to reasons why no disclosures were made [of] the sexual abuse of the [V]ictims." Order, 3/24/15, ¶ 3.

The charges proceeded to a jury trial in March 2024. The trial court summarized the trial testimony of the Victims and Stout:[4]

> The oldest of the boys was D.J. who was twenty-eight at the time of trial. . . . Right before his third grade year, his mother moved him and his brothers, L.J. and K.J., [into Wakeley's home.]
>
> D.J. was shown photos of the home and he described the interior of the home in detail. D.J. . . . recalled Wakeley initially introducing him and his brothers to pornography on the computer and magazines. . . . Wakeley would talk to the boys about sex and teach them about it. Specifically, Wakeley would tell the boys that they needed to know about sex and it was okay for Wakeley to teach them. According to D.J., Wakeley made the boys feel like "it was normal." [N.T., 3/18/24, at 132.]
>
> D.J. testified that Wakeley began this activity right after the family moved in . . . and . . . it progressed to getting his mother involved with Wakeley and his mother having sex in front of the boys. While Wakeley and his mother were having sex in front of the three boys, Wakeley would say it was okay to do that kind of stuff.
>
> D.J. [testified] about incidents of oral sex between himself and Wakeley and Wakeley penetrating D.J.'s anus. [T]hese incidents occurred after Wakeley would show the boys

_____

[4] For ease of review, when quoting the trial court in this decision, we have changed the court's references of "Defendant" to "Wakeley" and shortened the court's references of "Ms. Stout" to "Stout."

porn[ography] while telling [them] it was okay for Wakeley to touch the boys because it was normal.

While D.J. testified that most of the abuse occurred with just him and Wakeley, he later testified on cross examination that his mother would be nearby. . . . D.J. testified about an incident . . . when he was instructed to touch his mother's vagina. D.J. explained that Wakeley had a collection of toys and . . . told D.J. he could have them if D.J. would put his hand in his mother's vagina. D.J. [explained] that if they wanted toys, this was the only way they would be allowed to have them.

D.J. testified that the abuse from Wakeley stopped when he left for the [boarding school. H]e never told anyone about the abuse while it was occurring because Wakeley made them feel like it was [okay] and everyone was doing that kind of thing. In 2013, however, D.J. tried to make a report by calling a couple of police stations and . . . was to be interviewed by a police officer but he backed out. In 2018, he realized how much the abuse affected him[,] found the police officer's card in his wallet from 2013[,] and called the officer to report the abuse.

The middle child, L.J., was age twenty six at the time of trial. He testified that he was in first grade when his mother started dating Wakeley[. T]he first thing he was introduced to was pornography. He recalled walking into the living room and seeing his mother giving oral sex to Wakeley who was sitting at the computer watching pornography. [T]he abuse progressed to the boys being made to do sexual things to each other and to Wakeley.

L.J. testified that Wakeley taught him to "jerk off" to the magazines and then engaging in oral sex with Wakeley. [N.T., 3/18/24, at 164. L.J.] and his brothers were made to play with each other in a sexual manner. [L.J. stated that he only recalled "hand to penis" contact, and he denied being "forced to do oral sex on [his] brothers." N.T., 3/18/24, at 165, 171.]

L.J. recalled that the house had a "NASCAR room" which was where most of the abuse happened. [*Id*. at 162.] He also recalled an instance where they were enticed with a toy to place their finger into their mother's vagina. [E]ach of the boys came into the NASCAR room one by one and his mom was laid on the couch. He observed Wakeley digitally penetrate . . . his mother's vagina

- 4 -

and . . . Wakeley had each of the boys repeat that act. Afterward, L.J. [received] a yellow Tonka dump truck as a reward.

On cross-examination and on re-direct examination, L.J. testified that he and his brothers never talked about what happened to them. He also stated that they are not close to each other.

K.J., the youngest of the three boys, was age twenty-four at [the] time of trial. He testified that he was in kindergarten when he and his brothers and mother moved in with Wakeley. His first memory of Wakeley was when he came downstairs and he saw Wakeley sitting naked at the computer masturbating. [T]hings progressed to performing oral sex on Wakeley . . . in the living room [while Wakeley watched] pornography. [Wakeley made K.J. perform oral sex on] his older brothers and . . . stand around the bed with his brothers while Wakeley and his mother had sex. . . . Wakeley had them take their clothes off and masturbate while his mother and Wakeley had sex.

K.J. also testified that he would perform oral sex on Wakeley and touch Wakeley's penis with his hands. He recalled a specific incident when he was made to take his clothes off and perform oral sex on L.J.

The mother of the boys, . . . Stout, testified that she had been married to Wakeley. She met Wakeley online around 2004 and she and her three boys moved in with Wakeley after dating for four or five months. Stout testified she left Wakeley in 2013.[]

When asked about physical discipline . . . used by Wakeley against the boys, Stout answered that they would be paddled with a wooden paddle on their bare bottom. This was corroborated by each of the boys when they testified.

Stout also testified that Wakeley had a lot of pornography in the home but she mostly observed him watching pornography on the computer[, including] girls dressed up like little schoolgirls. Wakeley told her [his pornography viewing] was ["]what he was into[,] what he liked." [N.T., 3/18/24, at 104.]

Stout was then asked to describe what she saw Wakeley do with the children. She testified about one occasion when she walked in through the front door of the house and all three boys

were naked rolling around on the floor. Wakeley was present in his underwear and a T-shirt, which, she stated, was how he would normally walk around the house. On this occasion, she saw the boys "naked wrestling." [*Id*. at 102.] On another occasion, she walked into a room, called the "NASCAR room," and saw L.J. and Wakeley who had his penis exposed. [*Id*.] She testified that both of them had a "deer-in-the-headlight kind of look." [*Id*. at 103.]

Stout admitted to a situation when Wakeley involved her children while she and Wakeley were in their bedroom engaging in their "own situation." [*Id*. at 104.] Stout testified that she was blindfolded during the incident. She stated she could hear all three boys in the bedroom with her and Wakeley and Wakeley kept saying, "I'm not hurting her. It is for pleasure." [*Id*.] Stout then testified that Wakeley went into detail with the boys as to what he was doing to her[. S]he felt hands on her although she could not see who[,] but she believed that all three of her children touched her vagina.

In 2013, Stout left Wakeley after being investigated by [the Lancaster County Children and Youth Social Services Agency] because D.J. had made a report that he had been molested. In 2018, when interviewed by police, Stout . . . denied that anything had happened in the home but admitted that she lied to police because she was embarrassed and ashamed and she acknowledged that she would have been criminally charged.

When confronted on cross examination why she did nothing while her boys were being beaten with a board on their bare bottoms and screaming for her to help, Stout answered: ["]I failed them as a mother. That is what I did. I drank so I didn't hear things. I drank so I didn't see things.[" N.T., 3/18/24, at 121.] Stout also acknowledged that she was . . . being charged with three counts of indecent assault, three counts of endangering the welfare of children, and three counts corruption of minors.

Trial Court Opinion, 10/2/24, at 3-8 (footnote and some record citations omitted and one paragraph reformatted).

The Commonwealth also called as a witness S.Q., the subject of the pre-trial motion *in limine* ruling. In 1988, when she was approximately two years

old, S.Q.'s mother began dating Wakeley. This panel's prior memorandum summarized S.Q.'s trial testimony:

> S.Q. and her mother moved into a house with Wakeley shortly thereafter. Wakeley regularly sexually abused S.Q., including forcing her to perform oral sex on him, touch his penis, and grind on him while his penis was exposed. When Wakeley forced her to perform oral sex on him he would say "this is what Mommy does" and "Mommy swallows." N.T., 3/19/24, at 269.

> The abuse frequently occurred when S.Q.'s mother was at work. S.Q.'s mother separated from Wakeley when S.Q. was in kindergarten. However, S.Q. continued to spend every other weekend with Wakeley, and the sexual abuse continued during the visits.

> S.Q. described several instances of abuse that occurred when she was eleven years old. On one occasion, Wakeley asked her to look in a drawer, and she discovered the drawer was full of sex toys. Wakeley offered to use them on her or told her she could use them herself. Wakeley showed S.Q. pornography, including a picture of a woman having sex with a dog. Wakeley would frequently wrestle with her, during which he would touch her vagina and breasts over her clothing. Wakeley once set up an account for her on an internet dating chat room and encouraged her to discuss sexual matters with other users.

> In 2000, S.Q. discovered Wakeley was not her biological father and reported the abuse to her mother. S.Q. had no further contact with Wakeley after 2000. S.Q. stated that the abuse began when she was younger than five years old and continued until 2000.

*Commonwealth v. Wakeley*, 344 A.3d 1115 (Pa. Super. 2025) (unpublished memorandum at 7-8), *appeal granted and remanded*, ___ A.3d ___, 2026 WL 502496 (Pa. 2026).

The panel also summarized the trial testimony of the police officers as follows:

[Northern Lancaster Regional Police Detective Eric Zimmerman ("Detective Zimmerman")] testified that Wakeley agreed, in November 2022, to an interview in his home to discuss the allegations of abuse. However, Wakeley was not at his home at the scheduled time, and Detective Zimmerman subsequently learned that Wakeley had quit his job and moved.

Swatara Township Police Officer Francisco Gonzalez testified that in December 2022, he responded to a call regarding a man — later determined to be Wakeley — who barricaded himself in a hotel room. When officers arrived, Wakeley stated he intended to kill himself because there was a warrant for his arrest and he did not want "to get taken on" the warrant. N.T., 3/19/24, at 226. Wakeley stabbed himself in the wrists, elbow, legs, and neck before officers forcibly entered the room.

*Id*. at 8 (paragraph break added)

The jury convicted Wakeley of all charges: eight counts IDSI, six counts of indecent assault, and three counts of corruption of minors. On June 26, 2024, the trial court imposed an aggregate sentence of sixty-four to 140 years' imprisonment.[5] Wakeley filed a post-sentence motion, which the court denied. Wakeley then filed a timely notice of appeal.

In the initial appeal before this panel, Wakeley presented three issues for our review:

    I.   Did the trial court err in admitting the testimony of S.Q., where she testified to prior acts of . . . Wakeley which did not show that . . . Wakeley "used a common scheme or plan as it relates

---

[5] Wakeley's aggregate sentence consisted of: three consecutive twenty-to-forty-year terms of imprisonment for IDSI; three consecutive one-to-five-year terms of imprisonment for corruption of minors; and one consecutive one-to-five-year term of imprisonment for indecent assault. The court additionally imposed: five concurrent twenty-to-forty-year terms of imprisonment for IDSI; and five concurrent one-to-five-year terms of imprisonment for indecent assault.

to the alleged offenses in this case," but served only to suggest that . . . Wakeley was a person of bad character, who had acted in conformity with that character in the instant case?

II. Did the trial court err in overruling defense counsel's objection to . . . Stout's testimony that other adults were involved in her sex life with . . . Wakeley, as this testimony was irrelevant, prejudicial, and did not set the stage for the alleged misconduct between . . . Wakeley and . . . Stout's children?

III. Was the evidence presented by the Commonwealth insufficient to prove beyond a reasonable doubt that . . . Wakeley was guilty via accomplice liability of Count 7, involuntary deviate sexual intercourse, for having L.J. perform fellatio on his brother, where there was no evidence that L.J. performed fellatio on either of his brothers?

Wakeley's Brief at 8 (suggested answers omitted).

On July 18, 2025, this panel filed a memorandum, affirming in part and reversing in part. We denied relief on his first two issues, concerning the admission of S.Q.'s testimony about Wakelely's prior abuse, as well as Stout's testimony about her sexual relationship with Wakeley. However, this panel granted relief on Wakeley's challenge to the sufficiency of the evidence as to one count of IDSI. We reversed that conviction and vacated the judgment of sentence on that count. Because our disposition did not upset the overall sentencing scheme, we affirmed the balance of Wakeley's judgment of sentence and did not remand to the trial court for resentencing.

Wakeley filed a timely petition for allowance of appeal with the Pennsylvania Supreme Court. On February 24, 2026, the Court granted the petition, vacated our order, and remanded to this Court "for reconsideration in light of" its recent decision in *Walker*, 350 A.3d 54.

Briefly, **Walker** addressed the consolidation of the defendant's three separate offenses of rape, against three victims. **See Walker**, 350 A.3d at 56. The Pennsylvania Supreme Court reviewed in detail our jurisprudence on Rule of Evidence 404(b), governing the admission of evidence of other crimes, wrongs, or acts, and specifically the common plan, scheme, and design exception to this rule.

In this appeal, Wakeley's third issue, challenging the sufficiency of the evidence, does not involve any Rule 404(b) issue. Therefore, pursuant to the Pennsylvania Supreme Court's remand order, we do not reconsider that issue, and we enter the same disposition: we reverse Wakeley's conviction of IDSI at Count 7 and vacate the judgment of sentence on that count.

Wakeley's first claim concerned the trial court's admission of S.Q.'s testimony about the abuse she previously suffered at Wakeley's hands. This issue squarely involved review of Rule 404(b) and the common scheme, plan, or design exception. Thus, we reconsider this issue in light of **Walker**.

Finally, Wakeley's second issue concerned the admission of Stout's testimony, that their sexual relationship was "weird." N.T., 3/18/24, at 98. In his motion *in limine*, Wakeley argued, in an umbrella claim covering all of his evidentiary issues, that the evidence would "present[] extreme prejudice to [him], as it reference[d] alleged unrelated allegations that are not relevant or lawfully admissible as evidence in this case." Motion *in Limine*, 3/13/24, at ¶ 10. Additionally, in his appellate brief, Wakeley avers the testimony was

inadmissible under Rule 404(b).  **See** Wakeley's Brief at 30.  Accordingly, we likewise reconsider this issue under **Walker**.

In his first issue, Wakeley argues the trial court abused its discretion by allowing S.Q.'s testimony under Rule of Evidence 404(b).  We note:

> [T]he admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion.  An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality.

**Commonwealth v. Smith**, 325 A.3d 513, 518-19 (Pa. 2024) (citations omitted).

We note our well-established standard when addressing evidentiary challenges:

> All relevant evidence is admissible, except as otherwise provided by law.  Evidence that is not relevant is not admissible.  Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact.  Even if evidence is relevant, the court may nonetheless exclude it if its probative value is outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**Commonwealth v. Carter**, 320 A.3d 140, 147-48 (Pa. Super. 2024) (citation omitted).

As stated above, in **Walker**, our Supreme Court addressed Rule 404(b) and the common plan, scheme, and design exception.[6]  Pursuant to Rule 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Pa.R.E. 404(b)(1).  "[I]n other words, the Commonwealth cannot present evidence of a defendant's other bad acts solely for the purpose of establishing the defendant's propensity to commit crimes."  **Walker**, 350 A.3d at 62.

> However, Rule 404(b)(2)
>
> clarifies that other bad acts evidence may be admissible if it is offered for another (legitimate) purpose.  **See** Pa.R.E. 404(b)(2). Rule 404(b)(2) includes a non-exclusive list of other purposes, permitting other bad acts evidence when it tends to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  **Id**.  In a criminal case, regardless of the proffered exception, other bad acts evidence is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice."

**Id**. (some citations omitted).

Pennsylvania courts have recognized an exception to Rule 404(b)(1): "when the other bad acts evidence demonstrates a defendant's common plan, scheme or design.[]"  **Id**. (footnote omitted).  The **Walker** Court reviewed the

---

[6] Justice McCaffery authored the lead opinion, which two Justices joined. Justice Dougherty filed a concurring and dissenting opinion, which joined the portions of the lead opinion that we apply in this memorandum.  Accordingly, with four Justices in agreement about the holdings that are relevant to this appeal, we deem the lead opinion to the be majority opinion.

history of this exception, stating the following. "The genesis of this evidentiary exception can be traced back to our nineteenth century decision in ***Shaffner v. Commonwealth***, 72 Pa. 60 (1872)." ***Id***. In that case, the Court opined:

> To make one criminal act evidence of another, ***a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or*** it must be necessary to identify the person of the actor, ***by a connection which shows that he who committed the one must have done the other.*** Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to burthen a trial with multiplied issues that tend to confuse and mislead the jury. . . .

***Walker***, 350 A.3d at 62 (*quoting* ***Shaffner***, 72 Pa. at 65) (emphasis in ***Walker***).

> The ***Walker*** Court summarized:
>
> Thus, what evolved from [***Shaffner***] was a two-fold test to determine the admissibility of (arguable propensity) evidence pursuant to the common plan, scheme or design exception — other bad acts evidence was admissible if it demonstrated (1) a previously conceived plan that linked the prior crime and present crime together for a singular purpose or (2) crimes so similar that they must have been committed by the same actor.

***Id***. at 63. The first exception above

> has been referred to . . . as the "linked acts" theory. Evidence of other crimes or bad acts is admissible if the prosecutor establishes that the defendant formed "a single, overall grand design" and that each bad act or crime is an "integral component[ ] of the same plan; each criminal act is a stop or stage in the execution of the plan." Thus, the key to the "linked plan" exception is one overarching goal.
>
> The second ***Shaffner*** exception is commonly known as the defendant's *modus operandi* — "a pattern of criminal behavior so

- 13 -

distinctive that investigators attribute it to the work of the same person."

*Id*. (citations omitted).  The second, *modus operandi* exception

more appropriately applies to the "identity" exception listed in Rule 404(b)(2).[] This exception may be invoked when the other acts or "crimes of the accused (are) so nearly identical in method as to earmark them as the handiwork of the accused."  It requires more than "the mere repeated commission of crimes of the same class[;]" instead, "[t]he devise used must be so unusual or distinctive as to be like a signature."

*Id*. at 71.

The **Walker** Court further explained that over time, the Pennsylvania Supreme "Court has relaxed the strict parameters surrounding the exception[:]"

[The] two-pronged common plan, scheme, or design exception morphed into a more general consideration as to whether the defendant's other bad acts share "sufficient similarities" with the offense on trial.  In fact, a new test to determine "similarity" arose . . . — courts were to consider "the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed."

350 A.3d at 64.  The Court reasoned that what has emerged — a "logical connection" or "sufficient similarities" test — "does not demand the same high level of similarities between the acts as admission under the *modus operandi* or signature crime exception[, nor does it] require proof of an overarching plan or scheme linking the criminal acts together, as envisioned in **Shaffner**."  *Id*. at 72.  "Today, a common plan or scheme simply requires "shared characteristics" between the crimes and the victims."  *Id*.

- 14 -

The **Walker** Court then determined that "the time has come for this Court to acknowledge that the 'logical connection' test runs afoul of the purpose of Rule 404(b) and invites the admission of impermissible propensity evidence." **Id**. It "conclude[d] it is time to return to the origin of the common plan, scheme, or design exception, and limit the admission of other bad acts evidence to those cases involving a common goal (*i.e.*, "linked plan") or a signature crime." **Id**. at 73. The Court announced the proper test:

> When the admissibility of the defendant's other bad acts is premised upon the common plan, scheme, or design exception, the Commonwealth must establish either: (1) the offenses constitute "signature crimes" — that is, they are so unique and distinctive that they must have been committed by the same perpetrator — or; (2) the offenses were linked to achieve a common goal.

**Id**. at 75.

Finally, we consider in detail the particular evidence presented in **Walker**. The Commonwealth charged the defendant at three separate trial dockets for the following allegations. First, in January 2011, around midnight, the defendant was outside a convenience store when he "flashed money at [the victim, P.C.,] and said '[Y]ou know what to do for this.'" **Walker**, **Walker**, 350 A.3d at 57. At trial, the victim testified that she was not a prostitute, but followed the defendant to the alley because she was scared. **See id**. The defendant "pushed P.C. to her knees and tried to force her to perform oral sex on him[, then] punched her in the face and threw her body against a car[, and] forcibly pulled down P.C.'s pants and raped her." **Id**.

Second, in December 2014, in the morning, the victim, T.A., was walking after a drug treatment program when the defendant, whom she did not know, "inquired whether she was interested in purchasing headphones." *Id*. The victim expressed interest and the defendant asked her to walk with him. *See id*. The defendant then placed a knife at the base of her neck, told her, "[Y]ou're going to do what I'm telling you to do," and led her to an alley. *Id*. The defendant took the victim's money and cell phone, pushed her to the ground, forced her to perform oral sex, "grabbed her face, turned her around, . . . pushed [her] against a fence" and raped her. *Id*. The defendant did not return the victim's money or cell phone. *See id*.

Finally, in January 2015, in the morning, the victim was walking and encountered the defendant, whom she did not know, and asked where she could buy loose cigarettes. *See id*. The defendant responded that he sold them and told her to follow him, and she did, to the rear of a house. *See id*. at 58. The defendant entered the property, and as the victim waited outside, she "felt someone come behind [her], put their hand over [her] mouth, and trip [her] forward onto the ground [and] on [her] stomach." *Id*. The defendant attempted to pull down her pants, the victim screamed, and the defendant "struck her in the back with a tire iron[,] remove[d] her pants and forcibly" raped her. *Id*.

All three victims underwent sexual assault examinations, where nurse examiners recovered sperm evidence. *See Walker*, 350 A.3d at 57-58.

Several years later, in 2018, "law enforcement learned that the unknown male DNA samples recovered from all three victims matched," and ultimately that they linked to the defendant. *Id*. at 58.

As noted above, the Commonwealth filed charges against the defendant at three separate dockets, and subsequently sought to consolidate them for trial. *See id*.; *see also* Pa.R.Crim.P. 582(A)(1)(a) (permitting joinder of offenses charged in separate informations if, *inter alia*, "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion").

> Relying upon the exceptions to the admission of other bad acts evidence in Rule 404(b), the Commonwealth argued that the evidence of each assault would be admissible in a trial for the others because the assaults shared sufficient similarities to establish a common plan, scheme, or design, and they demonstrated an absence of mistake, that is, they rebutted any claim by [the defendant] that the acts were consensual. . . .

*Walker*, 350 A.3d at 58. Over the defendant's objection, the trial court granted joinder, reasoning that "the facts of each case were 'strikingly similar' and [the defendant's] '*modus operandi* corroborated the DNA matches' as well as the" defendant's identity. *Id*. at 60.

On appeal, the Pennsylvania Supreme Court applied the test that it announced — again, that

> [w]hen the admissibility of the defendant's other bad acts is premised upon the common plan, scheme, or design exception, the Commonwealth must establish either: (1) the offenses constitute "signature crimes" — that is, they are so unique and distinctive that they must have been committed by the same

perpetrator — or; (2) the offenses were linked to achieve a common goal.[]

*Id*. at 75 (footnote omitted).

With regard to the second prong, the **Walker** Court determined that there was no evidence that the defendant "had a preconceived goal in mind," or that the "crimes were . . . linked together in order to achieve a common goal." *Id*. at 73. "[T]he Commonwealth failed to present any evidence of a preconceived plan or common goal linking the three rapes together. [The defendant's] desire to rape women is not enough." *Id*. at 74. Instead, "the evidence reasonably suggested" that the defendant acted to "satisfy[] his own salacious interests" and that "he raped women when he was presented with the opportunity to do so." *Id*.

With regard to the whether the defendant's acts at each docket "could . . . be characterized as 'so unusual or distinctive as to be like a signature,'" the Court similarly determined that they could not. **Walker**, 350 A.3d at 72. The Court acknowledged that the crimes "were clearly 'similar,'" but highlighted the differences between them:

> In two of the cases, [the defendant] initiated contact with the victims; the third victim approached him. Two of the assaults occurred in the late morning; the third assault occurred near midnight. Each sexual assault occurred in a different Philadelphia neighborhood. Although [the defendant] convinced all three victims to follow him to a secluded area, in one case, he held a knife to her neck while doing so. He did not otherwise physically assault that victim; however, he punched another victim, and struck the third victim with a tire iron. He forced two of the three victims to perform oral sex on him before raping them. He robbed only one victim. One rape occurred three years before the other

two. Plainly, the three rapes for which [the defendant] was charged cannot be linked as signature crimes.

*Id*. at 72-73

The ***Walker*** Court thus concluded that the trial court abused its discretion in finding that "[t]he evidence of each of the offenses would . . . be admissible in a separate trial for the others pursuant to the common plan, scheme and design exception to the prohibition against propensity evidence." *Id*. at 76. Accordingly, the Court further determined that the trial court abused its discretion in granting the Commonwealth's motion to join the cases for trial. ***See id***. The Court awarded a new trial in each case. ***See id***.

In the instant appeal, Wakeley argues that the testimony of the prior victim, S.Q., did not show a common scheme, plan, or design between the sexual assaults against her and the Victims. Wakeley points to several alleged differences between S.Q.'s allegations and the charged offenses here: S.Q. was female and the Victims were male; the assaults of S.Q. always occurred outside of her mother's presence, while Stout was sometimes present during the assaults on the Victims; and the abuse of the Victims were "far more broad ranging," while the abuse of S.Q. was "mostly in the form of covert sexual touching, such as pretending to wrestle her and touching and grinding on top of her clothing." Wakeley's Brief at 23. Wakeley also contends that his abuse of S.Q. was remote in time from the abuse of the Victims because the former abuse ended in 1994, ten years before the latter abuse began in 2004. Finally, Wakeley argues that S.Q.'s testimony was "extremely prejudicial" to him, as

it portrayed him to the jury as "a serial sexual predator and a bad person." *Id*. at 24-25.

As stated in our prior memorandum, the trial court concluded that S.Q.'s testimony showed that Wakeley had a common scheme "to gain access to young children through their mothers" and sexually abuse them. Trial Court Opinion, 10/2/24, at 14. The court noted numerous similarities between the abuse of S.Q. and the Victims, including that: they were all his non-biological children; he was in a relationship with their mothers; all of the abuse occurred in Wakeley's home; and the abuse involved viewing pornography, touching, and oral sex. The court found that the lapse in time between the abuse of S.Q. and the Victims did not require preclusion, especially in light of the similarity of Wakeley's conduct. The trial court further determined that the probative value of S.Q.'s testimony outweighed any prejudicial impact, particularly in light of "the graphic details testified to by" the Victims. *Id*. at 13. The court observed that it provided cautionary instructions before S.Q. testified and prior to jury deliberations, minimizing any prejudicial impact on the jury from the other bad act evidence.[7]

---

[7] *See* N.T., 3/19/24, at 263, 338 (trial court instructing the jury that the Commonwealth offered S.Q.'s testimony for the limited purpose to show that used a common plan or scheme in perpetrating the assaults of S.Q. and the Victims; the evidence may not be considered for any other purpose; and the evidence may not be considered to show that Wakeley was a person of bad character or had criminal tendencies from which guilt may be inferred).

Applying *Walker*, we determine that the admission of S.Q's testimony was an abuse of discretion. *See* 325 A.3d at 518-19. We reiterate that *Walker* abrogated the "logical connection" and "sufficient similarities" tests to determine whether evidence was admissible under the common scheme, plan, and design exception to Rule 404(b)'s preclusion of other bad acts evidence. Accordingly, we apply the test announced in *Walker*.

First, we determine that Wakeley's abuse of S.Q., when compared to the instant abuse against the Victims, did not establish "a pattern of criminal behavior so distinctive that investigators [would] attribute it to the work of the same person." *Walker*, 350 A.3d at 63. We acknowledge the seriousness of Wakeley's offenses, and his targeting of vulnerable and young victims. Nevertheless, after careful review we determine his actions "were not so unique or distinctive as to qualify as signature crimes." *Id*. at 74. The Victims testified that Wakeley included all three boys and/or their mother in some of the sexual conduct — including making the Victims watch them engage in sex — S.Q. gave no testimony that Wakeley's abuse of her included her mother or other children. The Victims also testified about certain acts of abuse that did not appear in S.Q.'s testimony, including Wakeley's making the Victims perform sexual acts on each other, touching their mother's vagina under a promise of toys. Finally, identity was not at issue in this matter; Wakeley makes no claim on appeal that S.Q. or the Victims misidentified their abuser.

*See id*. at 73 (stating that "[t]he signature crime, or *modus operandi*, exception is most relevant when the identity of the perpetrator is at issue").

Second, we determine there was no evidence, nor even a claim by the Commonwealth, that Wakeley contemplated his abuse of S.Q., from 1988 through 2000, and the abuse of the Victims, from 2004 through 2013, to be "parts of one [previously conceived] plan in his mind." *Walker*, 350 A.3d at 64. The Commonwealth presented no evidence that when Wakeley committed the abuse against S.Q., he already had in mind a criminal objective to also abuse the Victims.

Our inquiry does not end here, however. We further determine, contrary to Wakeley's argument, that the admission of S.Q.'s testimony was harmless error. "In the event of an erroneous admission of evidence, a verdict can still be sustained if the error was harmless." *Commonwealth v. Yocolano*, 169 A.3d 47, 53 (Pa. Super. 2017) (citation omitted). "Harmless error exists where the appellate court is convinced beyond a reasonable doubt that the erroneously admitted evidence could not have contributed to the verdict." *Commonwealth v. Taylor*, 209 A.3d 444, 450 (Pa. Super. 2019) (citation omitted). Courts have found harmless error where "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Yocolano*, 169 A.3d at 53 (citation omitted).

Here, the Commonwealth presented overwhelming evidence proving Wakeley's guilt beyond a reasonable doubt. *See id*. Each of the Victims provided remarkably similar testimony regarding the sexual abuse, including such details as the location where it occurred — the "NASCAR room" — and the fact that Wakeley offered toys as rewards for participating in certain sexual acts. Stout confirmed much of the abuse, notwithstanding that she was admitting that she also perpetrated abuse on her sons. Moreover, the Commonwealth presented evidence of Wakeley's consciousness of guilt when he failed to appear for an interview with Detective Zimmerman, then fled and attempted suicide. We conclude that even without S.Q.'s testimony, the remaining "properly admitted and uncontradicted evidence of guilt was so overwhelming . . . that the error could not have contributed to the verdict." *Yocolano*, 169 A.3d at 53. For the foregoing reasons, we do not disturb the trial court's decision to admit S.Q.'s testimony.

In his second issue, Wakeley argues that the trial court abused its discretion by permitting Stout to testify that other adults were involved in the couple's sexual relationship. By way of background, we reiterate that in his motion *in limine*, Wakeley averred that such evidence "reference[d] alleged unrelated allegations that are not relevant or lawfully admissible . . . in this case," and would be extremely prejudicial. Motion *in Limine*, 3/13/24, at ¶ 10. The court partially denied relief, allowing such testimony that "relate[d] to circumstances in the home *[that the Victims] observed*" or "relate[d] to

reasons why no disclosures were made [of] the sexual abuse of the [V]ictims." Order, 3/24/15, ¶ 3 (emphasis added).

At trial, on direct examination, Stout testified that their relationship became "[s]exually weird" and Wakeley frequently involved "other couples" and strangers. N.T., 3/18/24, at 98. Wakeley objected, arguing that Stout's testimony related to "the weird . . . general sexual relationship," rather than anything the Victims observed. *Id*. at 99. The trial court overruled the objection on the grounds that Stout's testimony "sets the stage for what was going on" inside the home. N.T., 3/18/24, at 99. Stout then described "what the sex life was like with" Wakeley: "Threesomes, other couples, adult book stores. They have little booths and theatres, just voyeurism, outdoor situations." *Id*. at 100. Stout further stated that the Victims were "sometimes" "in the home" when this occurred. *Id*.

On appeal, Wakeley argues Stout's testimony, regarding the involvement of other adults in the couple's sex life, was irrelevant to the charges in this case and contrary to the motion *in limine* ruling limiting her testimony to sexual matters the Victims personally observed. While Stout testified the Victims were sometimes home during the incidents, Wakeley avers nothing shows that the Victims observed the couple engage in sexual activities with other adults or that other adults were present during the abuse of the Victims. Additionally, Wakeley asserts the evidence was inadmissible under Rule 404(b). Finally, Wakeley contends that the trial court's error was

not harmless, and Stout's testimony was prejudicial because it led "the jury to conclude that [his] sexual behavior was inappropriate even where the [Victims] were uninvolved or unaware." Wakeley's Brief at 30.

The trial court reasoned that Stout's testimony "provided insight into a dysfunctional family dynamic in which the [Victims] would not be sheltered from actively participating in adult sexual activity, including group sexual activity with Wakeley and their mother." Trial Court Opinion, 10/2/24, at 16. The court additionally concluded that, even assuming the admission of the testimony was in error, such error was harmless. The court found that the evidence of the sexual abuse suffered by the Victims was overwhelming in light of the "strikingly similar" testimony by each of the Victims. *Id*.

After careful review, we determine it was an abuse of discretion to admit this portion of Stout's testimony. While Stout testified that the Victims were "sometimes" "in the home" when she had sexual relations with other adults, she did not state that the Victims observed this conduct. N.T., 3/18/24, at 100. Additionally, the Victims did not testify that they witnessed Stout and Wakeley engaging in sexual acts with other adults. Thus, Stout's testimony exceeded the scope of the trial court's ruling which permitted testimony regarding the couple's sex life only to the extent the Victims observed the conduct.

Additionally, we determine the testimony was not admissible under *Walker* and Rule 404(b). The Commonwealth made no claim and presented

no evidence that the sexual relationship solely between Wakeley, Stout, and perhaps other adults, when compared with Wakeley's abuse of the Victims: (1) were a part of the same common criminal goal; or (2) presented such unique or distinctive facts as to establish a signature crime. *See*, *Walker*, 350 A.3d at 74.

Nevertheless, we conclude, similar to Wakeley's first issue, that the admission of this portion of Stout's testimony was harmless error. Even without this testimony, the Commonwealth presented overwhelming evidence to establish Wakeley's guilty beyond a reasonable doubt. We incorporate our above discussion — that the Victims provided strikingly similar testimony, and Stout's other testimony, on other issues, corroborated it. For the foregoing reasons, we do not disturb the trial court's admission of Stout's testimony about her sexual relationship with Wakeley.

In sum, we continue to deny relief on Wakeley's two evidentiary claims, albeit on different grounds after reconsideration in light of *Walker*. We reverse Wakeley's conviction at Count 7 and vacate his judgment of sentence at that count and affirm the remainder of Wakeley's convictions. Because our disposition does not affect the overall sentencing scheme, we affirm the balance of Wakeley's judgment of sentence.

Conviction of IDSI with a child at Count 7 reversed. Convictions at all other counts affirmed. Judgment of sentence vacated at Count 7 and affirmed in all other respects. Jurisdiction relinquished.

President Judge Lazarus joins this decision.

Judge Bowes concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/28/2026